UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JANE DOE | * | |
| | * | |
| Plaintiff, | * | |
| | * | **PLAINTIFF CLAIMS** |
| v. | * | **TRIAL BY JURY** |
| | * | |
| EMERSON COLLEGE, | * | |
| LEE PELTON, INDIVUALLY AND | * | |
| AND AS PRESIDENT OF EMERSON | * | |
| COLLEGE, RONALD LUDMAN, | * | |
| INDIVIDUALLY AND AS DEAN OF | * | |
| EMERSON COLLEGE, DAVID HADEN, | * | |
| INDIVIDUALLY AND AS DIRECTOR | * | |
| OF HOUSING AND RESIDENCE LIFE, | * | |
| DANIELLE MASTRONARDI, | * | |
| INDIVIDUALLY AND AS RESIDENCE | * | |
| DIRECTOR AT EMERSON COLLEGE, | * | |
| KIM MARCELLA, INDIVIDUALLY AND | * | |
| AS TITLE IX INVESTIGATOR, | * | |
| AND MICHAEL ARNO, INDIVIDUALLY | * | |
| AND AS TITLE IX INVESTIGATOR. | * | |
| | * | |
| Defendants. | * | |

## COMPLAINT

This cause of action arises from Defendants' deliberately indifferent response to a
student-on-student sexual assault. Defendants' failure to promptly and appropriately investigate
and respond to the assault subjected Plaintiff to a hostile environment, effectively denying her
access to educational opportunities. This action alleges violations of Title IX of the Educational
Amendments of 1972, 20 U.S.C. § 1681 as well as claims of negligence, negligent infliction of
emotional distress, and intentional infliction of emotional distress.

## PARTIES AND JURISDICTION

1.      The Plaintiff, Jane Doe, (hereinafter "Plaintiff Doe") resides in Washington D.C.

2.      The Defendant Emerson College (hereinafter "Emerson College") is a private institution of higher learning that receives federal funding, and is located in Boston, Massachusetts.

3.      The Defendant Lee Pelton (hereinafter "Pelton") at all times relevant to this lawsuit was the President of Emerson College, with a principal place of business at 120 Boylston Street, Boston, Massachusetts 02116.

4.      The Defendant Ronald Ludman (hereinafter "Ludman") at all times relevant to this lawsuit was the Dean of Emerson College, with a principal place of business at 120 Boylston Street, Boston, Massachusetts 02116.

5.      The Defendant David Haden (hereinafter "Haden") at all times relevant to this lawsuit was the Director of the Office of Housing and Residence Life at Emerson College, with a principal place of business at 120 Boylston Street, Boston, Massachusetts 02116.

6.      The Defendant Danielle Mastronardi (hereinafter "Mastronardi") at all times relevant to this lawsuit was the on duty  Resident Director at Emerson College the night of Doe's sexual assault, with a principal place of business at 120 Boylston Street, Boston, Massachusetts 02116.

7.      The Defendant Kim Marcella (hereinafter "Marcella") at all times relevant to this lawsuit was the Director of Employment and  the Title IX investigator of Plaintiff Doe's case at Emerson College, with a principal place of business at 120 Boylston Street, Boston, Massachusetts 02116.

8.      The Defendant Michael Arno (hereinafter "Arno") at all times relevant to this lawsuit was the Director of Student Conduct and  the Title IX investigator of Plaintiff Doe's case at Emerson College, with a principal place of business at 120 Boylston Street, Boston,

Massachusetts 02116.

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1367 (supplemental jurisdiction) and the doctrines of ancillary and pendent jurisdiction

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the defendant Emerson College is located in this judicial district and a substantial part of the events which give rise to the claims herein occurred in this district.

## APPLICABLE LAW AND POLICY

11.     Title IX of the Educational Amendments of 1972 (hereinafter "Title IX"), 20 U.S.C. § 1681(a) states that

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance…

12.     Title IX is implemented through the Code of Federal Regulations. See C.F.R. Part 106.

13.     34 C.F.R. § 106.8(b) provides"

> …A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part.

14.     In *Gebser v. Lago Vista Independent School District,* 524 U.S. 274 (1988), the United States Supreme Court recognized that a recipient of federal educational funds intentionally violates Title IX, and is subject to a private damages action, where the recipient is "deliberately indifferent" to known acts of teacher-student discrimination.

15.     In *Davis v. Monroe County Board of Education,* 526 U.S. 629 (1999), the United States Supreme Court extended the private damages action recognized in *Gebser* cases

where the harasser is a student, rather than a teacher.

16.    *Davis* held that a complainant may prevail in a private Title IX damages action

against a school district in cases of student-on-student harassment where the funding

recipient is

     a.  deliberately indifferent to sexual harassment of which the recipient
         has actual knowledge, and
     b.  the harassment is so severe, pervasive, and objectively offensive
         that it can be said to deprive the victims of access to the
         educational benefits or opportunities provided by the school.

*Davis*, 526 U.S. at 1669-76.

## FACTS COMMON TO ALL CAUSES OF ACTION

17.    At all times relevant, Plaintiff Doe was a full time freshman student at Emerson

College.

18.    On or about October 13, 2012, Plaintiff Doe was sexually assaulted by a fellow

Emerson student, hereinafter Student A and a Massachusetts Institute of Technology

student, hereinafter MIT Student at a  Massachusetts Institute of Technology fraternity

party.

19.    At all relevant times, the Emerson student, Student A was a sophomore at

Emerson College, and lived on the same dormitory floor as Plaintiff Doe. Doe initially

became acquainted with Student A through Student A's roommate.

20.    On or about the night of October 13, 2012, Plaintiff Doe was in Student A's dorm

room with an Emerson fellow student. Student A served Doe alcohol in pre-mixed drinks.

Doe later came to believe that she was drugged by Student A, because she felt fuzzy and

lightened unusually quickly, and the drink made her feel "out of it."

21.    The other student was in and out of Student A's room during that time, but when

he took a sip of Doe's drink, Student A told him not to drink it, and offered to make him one of his own.

22.     Later that night, Doe left with Student A and several other suitemates from Emerson College for an off campus party at Delta Kappa Epsilon ("DKE") fraternity house at Massachusetts Institute of Technology ("MIT"). Student A had encouraged Doe to attend the party.

23.     Prior to the party, Doe only had consumed two mixed drinks, but began to feel ill while on the MBTA's Red Line. Doe remembered that her head "felt fuzzy" and her stomach hurt. When Doe told Student A she did not feel well, Student A told Doe it was a result of just "cheap alcohol."

24.     When the group arrived at DKE, Doe began to feel worse while waiting in line to enter the party. Student A and Doe walked ahead from the rest of Doe's suitemates, and Doe mentioned she needed a bathroom. Student A left saying she would "find one."

25.     Shortly after Student A left Doe outside, a member of DKE, MIT Student, greeted Doe outside the line, and invited her in. Doe had never met MIT Student before that night.

26.     Inside DKE, MIT Student stated that he wanted to "show her something" and walked her into a first floor office. Student A was sitting in the back of the office when Doe entered.

27.     MIT Student then slammed Doe's head against the wall, and forced her to the office floor where he then proceeded to rape her. Because of her trauma and the effects of the drink Student A gave her, Doe did not recall until later that Student A sexually assaulted Doe by performing oral sex on her.

28.     After the sexual assault, Student A told MIT Student "tell her she can go home now." Doe quickly escaped, and took a cab back to her dorm.

29.     At approximately 12:30 A.M. Doe texted her friend come to her dorm room. At this time Doe was still in shock over what happened. Upon the friend's arrival, Doe was visibly upset and crying. Doe disclosed to her friend that she was sexually assaulted.

30.     Doe's friend immediately informed an Emerson Resident Assistant (RA) Dylan Manderlink ("Manderlink") that Doe had been raped.

31.      At first, Doe was hesitant to speak with Manderlink, but Manderlink stated she wouldn't disclose anything Doe told her except to the Residence Director on duty to ensure Doe got the help she needed.

32.     Due to the shock and trauma, Doe wanted time to think about these incidents and instead chose not to report it to the Emerson Police Department. Manderlink offered to escort Doe to the Emerson College police precinct and call a counselor on call if that was what Doe wanted. Doe was frightened, confused and exhausted.

33.     On or about October 14, 2012, Defendant Mastronardi came to Doe's dorm room holding a pile of sexual assault pamphlets.

34.     Doe's suitemate answered the door and saw the pamphlets, thereby learning about the rape against Doe's wishes, which she wanted to keep her assault confidential.

35.     Defendant Mastronardi then questioned Doe from the doorway of Doe's suit, and anyone who walked by could hear their conversation.

36.     Defendant Mastronardi asked Doe in a condescending and disrespectful way, "Are you sure you were raped and not just drunk?"

37.     Defendant Mastronardi did not provide information on Emerson's Title IX

grievance process, and left the sexual assault pamphlets for Doe, none of which provided information on her rights under Title IX.

38.     On that same day, October 14, 2012, Doe questioned Student A about something bad she remembered that happened at the party. Student A replied, "Oh were you raped?" Due to the trauma and shock, Doe fully recall at this time that Student A had sexually assaulted her as well.

39.     On October 14, 2012, a few hours after speaking with Defendant Mastronardi, Doe disclosed the rape to her friend who encouraged Doe to report the rape to the police as well as urged Doe to get a rape kit. Doe agreed.

40.     Doe, her friend, and Manderlink went to the Emerson Police Department. Doe was put into a room. Doe requested to speak with a female officer and wanted to have one of her friends present as support during the interview. However, Doe was denied both requests. The police stated that there was no female officers working that evening and told Doe that having a friend in the interview room would "influence her testimony."

41.     Doe spoke to a male Emerson police officer, who made told her she had to write out her report. While she was writing, she was continually asked if she was sure it was rape. Upon finishing the written testimony, the officer told Doe, in an intimidating and threatening manner, that she had "better be sure" that she was raped, because rape is a "serious accusation." Doe replied that she was sure.

42.     The officer commented on Doe's inability to be sure since she was drinking. He also pointed out that her consumption of alcohol was a violation of the college's alcohol policy since she was underage, making her feel uncomfortable, intimidated, and threatened.

43.     After writing her statement, Doe was told that the Boston Police Department were being called to investigate the case, and Emerson would no longer take responsibility in the investigation.

44.     Doe did not want the police to be called, but against her wishes, the Boston Police came in and two male officers interviewed Doe again. After this interview, the Boston Police Department advised Doe that the proper jurisdiction belonged with the Cambridge Police Department. Cambridge Police were called, and they began another investigation.

45.     On October 15, 2012, Manderlink and Doe's friend accompanied Doe to Tufts Medical Center where she received a rape kit, emergency contraceptives, and medication to protect her against sexually transmitted diseases. Doe also received medical care for several minor abrasions on her thighs, and lower eye lid from the assault.

46.     Later, on October 15, 2012, Student A came by Doe's room, and Doe asked Student A for the name of the frat house where she was assaulted. Doe googled the frat house, and looked through photos of the fraternity members in order to identify her attacker.

47.     Upon seeing MIT Student, Doe recognized him, and immediately shut her computer before Student A could see.

48.     Doe went to Manderlink's room to tell her she could identify her assailant. Manderlink called Detective Logan from the Cambridge Police Department, and emailed him the webpage to the fraternity.

49.     A few days later, Cambridge Police interviewed Doe and Student A. The police then re-interviewed Doe for clarification about Student A's involvement. At this point, Doe did not totally recall Student A being present during the rape or having sexually

8

assaulted her.

50.     On November 15, 2012, Doe met with Detective Logan and an MIT police officer in a conference room in the Emerson College Police Department. The officers informed Ms. Doe that in the lab results the police found no DNA evidence linking MIT Student to the crime, but there were traces of a female's saliva.

51.     The officers then began to re-question her about Student A's involvement. Fifteen minutes after the officers left, Doe started to have an anxiety attack mixed with flashbacks of that night. She remembered Student A holding her down while MIT Student raped her, and also remembered Student A performing oral sex on her.

52.     As a result of these new memories, Doe was re- traumatized and attempted suicide.

53.     Doe was hospitalized for two days at Tufts Medical Center due to her suicide attempt, PTSD, and depression.

54.     In early December, upon returning from Emerson after a three week leave for hospitalization, Doe spoke with Defendant David Haden for the first time. Defendant Haden emailed Doe that the only way to continue living on the Emerson campus was to meet with him. The meeting took place in early December before Doe left for winter break. The meeting was originally to discuss the suicide attempt, but Doe decided to inform Haden of the rape and Student A's involvement.

55.     Defendant Haden discouraged Doe from formally reporting Student A's role in the rape. Defendant Haden told Doe to "control her allegations" against Student A and keep it a "private matter." Defendant Haden also failed to explain the complaint process after Doe said she wanted to open a formal investigation against Student A.

56.     During this time Student A lived on the same floor as Doe, but Emerson College made no efforts to move Student A or to otherwise ensure Doe's safety on campus although Doe asked for protection from Student A.

57.     On December 14, 2012, Doe informed Residence Director Caitlin Courtney that she wanted Student A moved off her floor. Director Courtney informed Doe that there was never any formal complaint opened against Student A, which was required to move Student A off of the floor.

58.     During their conversation, Director Courtney told Doe that she could begin a formal complaint process through Emerson College, but Director Courtney did not provide information on this process. She only commented that "Title IX is what we call investigations that are about sexual misconduct."

59.     Doe asked Director Courtney to clarify the process, but Director Courtney was unable to give her more information.

60.     It was also during this conversation that Director Courtney recommended and encouraged  Doe that she should drop the criminal investigation against Student A and MIT Student.

61.     Believing Director Courtney had her best interests in mind, Doe informed Detective Logan that she was not going to move forward with the criminal investigation.

62.     After the criminal investigation was suspended, Emerson College opened an investigation in January against Student A, months after the assault originally occurred.

63.     After Doe returned from winter break in January, she had a meeting with Defendant Arno and Director Courtney. Doe told Defendant Arno the whole story, and Arno appeared to be shocked. He told Doe, "We will get this figured out," which made

Doe feel like something was going to be done.

64.     On February 19, 2013, Defendant Arno and Defendant Marcella interviewed Doe. These two Emerson College employees represented that they were Title IX investigators. During the interview, these Defendants asked Doe questions about what she was wearing on the night of her assault, her relationship with Student A prior to the assault, and what she believed happened the night of her assault. Doe felt as if she was being judged by what she was wearing.

65.     Doe became emotionally upset talking about her rape, so Defendant Marcella sternly asked her to leave the room and come back to speak about her allegations after she could "control her emotions." Defendant Arno agreed with Defendant Marcella concerning Doe's emotions and added, "We can't do an unbiased investigation if you are emotional." This made Doe even more fearful that she was being criticized and attacked by Emerson.

66.     After a brief break, Defendant Arno asked Doe why she believed Student A raped her. Doe became traumatized, couldn't answer, and was choked up. Defendant Arno abruptly announced the interview was over. Defendant Arno and Defendant Marcella said the investigation would continue through interviews with members of the Emerson community, but they never took any action.

67.     During this time, Doe went to health services, and began seeing a counselor.

68.     Each time her counselor at Emerson would defend Emerson any time Doe mentioned anything critical about the school, and their handling of her assault. She would tell Doe that she was "overanalyzing things" in her head.

69.     On March 1, 2013 Doe left Emerson College's Union Bank Building from her

creative writing class around 3:30 P.M. Doe then saw MIT Student and Student A across

the street. Doe started walking in the opposite direction, but MIT Student and Student A

pushed Doe into an alley.

70.     In the alley, Student A grabbed at Doe's crotch to simulate digital penetration.

Doe reported the assault with the Emerson Police Department the same day, and then left

the next morning for her home in Florida.

71.     While in Florida, Defendant Ludman called Doe's mother and informed her of her

daughter's assaults, without Doe's consent, breaching any confidentiality Doe expected.

Instead of addressing this new allegation of retaliatory harassment against Doe,

Defendant Ludman told Doe's mother that he believed it would be best if Doe "took time

off," and returned to campus after Student A graduated, suggesting Doe should not

proceed with her complaint.

72.     Doe heard nothing more about her case since the meeting with Defendants Arno

and Marcella in February. During that period of time, Student A sent harassing text

messages and emails that included information only someone present during her assault

would know. For example, one text read: "Haha Give up already. I am never going to get

caught and neither is MIT Student. No one believes you and never will. You are a dirty

girl." Another read, "You Suck. Give up Already. Stop Fucking Trying, no one believes

you. Your a dirty little slut. MIT Student knows it, I know it, and everyone knows it."

These were brought to the attention of Arno who said they were "going to try and trace

them." However, Arno never took Doe's phone.

73.     In March, Defendants Arno and Marcella told Doe that there was "not enough

information to go forward with an adjudication process" in regards to Doe's first

complaint. However, they did request another interview with Doe concerning the second report.

74.     Doe agreed to meet if she could have her friend  present. When they arrived at the meeting, Defendants Arno and Marcella told Doe that her friend could not be with her during the meeting. The Defendants talked to the Title IX coordinator, Alexa Jackson, and Coordinator Jackson then agreed that the friend could be present.

75.     Doe requested that Student A be removed from here area and not communicate with Doe. Coordinator Jackson told Doe that things were being done to resolve her complaint, but that Student A was still allowed to enter Doe's residence hall. Doe felt unsafe, but Coordinator Jackson replied that "fear was not enough reason" to deny Student A access to the residence hall.

76.     On March 8, 2013, Emerson College imposed a mutual no contact order against Doe and Student A.

77.     Despite the stay away notice in place, Doe continued to receive harassing text messages from Student A. One text read "You are a f****** bitch. Go die. I wish you died last time you tried. You are not going anywhere with this so stop trying." Doe showed the messages to Defendants Marcella and Arno, but they told Doe that they were a sign that Student A wanted to be in contact with Doe, and that Doe should take that as a compliment.

78.     On March 22, 2013, another student left a note written by Student A about Doe on a couch in Doe's residence hall. Doe informed Emerson College and brought a witness to the meeting where the note was handed to Coordinator Jackson. Doe remembered the note mentioned dirty deeds that Student A wanted to perform on Doe.

79.     The school confirmed the note was from Student A, but did not take any action.

80.     On April 14, 2013, Student A admitted sexually assaulting Doe along with MIT Student in a harassing and threatening email message.

81.     The email read: "Hey whore, So I have been drinking all weekend with those little friends of yours and found myself at this party at the Delta Kappa Epsilon Frat house, Where MIT Student and I f****** you, remember haha? Make any more noise about that night and I will kill you. You were asking for it, and I know you enjoyed it. You were a stupid virgin and now have something to be grateful for so start respecting me and MIT Student. Go to Hell Bitch. Love, C."

82.     Doe informed Defendants Arno and Marcella about the message, but both told Doe that because the message was sent anonymously, they could not prove Student A had sent it.

83.     On May 2, 2013, Emerson College told Doe that her complaints against Student A for rape, sexual assault, intimidation, and retaliation were "not supported by the preponderance of the evidence." Doe was told no charges would be brought against Student A, so no hearing would occur. Doe was devastated and felt vulnerable to further attacks.

84.     Emerson College also declined to take action despite having determined Student A had written a message to threaten and intimidate Doe, because they believed "Student A exercised poor judgment in her choice of words in the note, but that she did not intend for the note to be read by you or to threaten or intimidate you."

85.     On May 24, 2013, Doe responded to the findings, noting her disappointment and the revictimization she experienced using Emerson College's process.

86.     On October 18, 2013, Doe filed a Title IX complaint with two other Emerson students with the Department of Education.

87.     On October 18, 2013, Doe requested an appeal of the denial of her complaint to Emerson so the investigation could be reopened and an adjudication occur. Defendant Ludman denied this request and told Doe that unless additional incidents or circumstances came up, the case could not be reopened.

88.     In the Spring of 2014, Doe had to take a two week leave of absence due to her increasing suicidal thoughts and depression. Doe was unable to attend classes, and felt life was no longer worth living. Doe attempted suicide, and her friend took her to the hospital.

89.     Following her psychiatrist's orders, Doe took a two week leave of absence to attend a partial hospitalization program at Arbor Hospital in Jamaica Plain. During this time, Doe did not attend class, and no notes, recorded lectures, or accommodations were offered by Emerson.

90.     During the Fall of 2014, Doe participated in Emerson College's Washington D.C. program at the Washington Center in order to stay away from the hostile and threatening campus environment of Emerson.

91.     On September 14, 2014, Doe suffered a severe panic attack, which included ongoing flashbacks to her rape and previous interactions with Emerson College administrators. The thought of returning to Emerson in the Spring further overwhelmed her. As a result, Doe overdosed by taking full bottles of Xanax and Klonopin, anti-anxiety drugs proscribed t o her.

92.     Doe then called a personal friend who called the Emerson College Police

Department in order to get the necessary medical attention to Doe.

93.     The Emerson Police initially dismissed her concerns about Doe's health, and found it difficult to get them to take immediate action.

94.     On September 15, 2014, the Washington Center Director confronted Doe, stating he had contacted Defendant Ludman about her hospitalization and its cause.

95.     Defendant Ludman spoke to Doe on the phone, and told Doe that Emerson College would support the Washington Center's choices in whether or not Doe should leave the program.

96.     On September 16, 2014, the Washington Center decided Doe could continue in the internship and academic program.

97.     Doe chose to call Defendant Ludman on her own accord to make sure she was in line with Emerson policy. Defendant Ludman explained to Doe that although she was enrolled in the Washington Center, he suggested she should take time off or "leave the college."

98.     Defendant Ludman claimed Doe's actions were a "threat to the Emerson College community."

## COUNT I
## VIOLATION OF TITLE IX AGAINST DEFENDANT EMERSON  COLLEGE

99.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 98 of this Complaint as more fully stated herein.

100.     Emerson College's acts and failure to act with respect to Jane Doe's allegations of sexual assault by a female Emerson College student as well as by a male MIT student deprived Jane Doe of her rights on the basis of her gender.

101.     The assault suffered by Jane Doe is, by nature, discriminatory on the basis of her

female gender.

102.    Emerson College and its officials had actual and/or constructive notice of the assault on Jane Doe. These officials had the duty and authority to address this type of conduct.

103.    Emerson College and its officials had actual and/or constructive notice of other past sexual assaults that occurred before Doe reported her rape. Emerson College failed to properly respond to those complaints, and failed to adequately implement policies designed to educate their students and administrators and protect their students.

104.    Emerson College and its officials and officers responded to Jane Doe's complaint by failing to act and/or acting with deliberate indifference or in a manner clearly unreasonable in light of the known circumstances.

105.    Emerson College failed to investigate Jane Doe's reported sexual assault in any meaningful way.

106.    Emerson College failed to act promptly and equitably in response to Jane Doe's reported sexual assault.

107.    Emerson College took no steps to provide useful academic support or to otherwise accommodate Jane Doe after she reported the assault.

108.    Emerson College's failure to act in an effective manner resulted in Jane Doe feeling unsafe on her own campus, attempting to take her own life, and taking prolonged leave of absences from school, thereby exacerbating her impaired mental state arising from the assault and effectively denying her access to the educational benefits and opportunity from either Emerson College or from any other college or university.

109.    Emerson College's response to Jane Doe's complaint of sexual assault was not reasonably calculated to, and thereby failed to, end the discriminatory conduct faced by Jane

Doe.

110.    Emerson College's responses to Jane Doe's complaint were not reasonably calculated to prevent this type of discrimination from recurring on campus.

111.    Emerson College failed to restore Jane Doe to pre-deprivation status.

112.    The sexual assault committed upon Jane Doe occurred in at an off campus party, however was perpetrated by an Emerson student living in the same Residence Hall as Jane Doe.

113.    The assault on Jane Doe involved conduct so severe and objectively offensive that it deprived Jane Doe of her educational access and benefits.

114.    At all relevant times, Emerson College receives federal funds.

115.    Emerson College's policies and procedures for reporting sexual harassment and sexual assault, as described in the annual Student handbook and Code of Conduct are inadequate.

116.    In addition, Emerson College failed to follow its own published guidelines by not conducting the hearing process in the manner proscribed in the Student Handbook.  Despite the inadequacy of these guidelines, Emerson had a duty to follow what they themselves had put in place.

117.    Emerson College's procedures failed to meet the requirements of Title IX. These failures include, but not limited to:

- Failure to properly educate and train their administrators.

- Failure to properly educate their students about sexual assaults and Title IX.

- Failure to provide adequate timelines for the prompt investigation and resolution of complaints.

- Failure to ensure that findings will be reached regarding complaints filed.

- Failure to define which sanctions are available through various Emerson

College procedures, how they overlap, and under what circumstances they may be implemented.

118.     Emerson College relied solely on the inadequate investigation of Kimberly Marcella and Michael Arno and their conclusions instead of attempting to verify Jane Doe's complaint and any defenses.

119.     In addition, Emerson College's procedures placed the burden on the complainant to initiate all relevant procedures to resolve fully a complaint of sexual abuse. The requirement of Title IX that procedures be equitable is to ensure that the reporting process is not dependent upon a complainant's inner fortitude and tenacity.

120.     Emerson College's procedures are on their face, and in their application, inequitable because there are not enforced uniformly and are not easy to follow, thus functioning as a barrier to complaints.

121.     Jane Doe was systematically denied the means to achieve a prompt and equitable resolution of her complaint, including her right to a thorough and objective investigation.

122.     Emerson College has fostered and perpetuated a hostile education environment on the basis of sex on its campus in violation of Title IX and its implementing regulations. Emerson and their administrators failed to take seriously sexual assault complaints, and did not provide their students with the proper resources they needed to handle these assaults. Instead, they left their female students, who had been assaulted, isolated and afraid to come forward for fear of being re-victimized and humiliated.

## COUNT II
## NEGLIGENCE AGAINST DEFENDANTS EMERSON COLLEGE, LEE PELTON, RONALD LUDMAN, DAVID HADEN, DANIELLE MASTRONARDI, KIMBERLY MARCELLA AND MICHAEL ARNO

123.     Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 122 of this

Complaint as more fully set forth below.

124.    Emerson College, through its school publications, acknowledged and accepted its duty to protect its students, including Jane Doe and to provide a safe environment for them.

125.    Defendants Pelton, Ludman, Haden, Mastronardi, Marcella and Arno, as administrators, had a duty to implement and enforce the school's published guidelines, codes, regulations, and policies designed to protect Emerson College's students.

126.    Emerson College's own publications acknowledge that sexual assaults at colleges are foreseeable circumstances.

127.    Emerson College's own publications acknowledge that a student may be unable to consent to sexual conduct due to coercion or voluntary or involuntary alcohol or drug use.

128.    Emerson College and Defendants Pelton, Ludman, Haden, Mastronardi, Marcella, and Arno failed to take reasonable precautions to safeguard its students, and failed to follow the school's guidelines with respect to responding to reported sexual assaults perpetrated by Emerson students.

129.    Emerson College's lax enforcement of its alcohol policy created an environment in which alcohol-induced misconduct was manifestly foreseeable, and accepted it, ignored it, and allowed this type of misconduct to proliferate.

130.    Sexual assault is a widely acknowledged risk of unchecked alcohol consumption occurring on a college campus where young adults are left improperly supervised by college officials.

131.    Emerson College and defendants Pelton, Ludman, Haden, Mastronardi, Marcella and Arno breached their duty to Emerson College's students, including Jane Doe.

132.    The breaches committed by defendants Emerson College, Pelton, Ludman, Haden,

Mastronardi, Marcella, and Arno proximately caused severe physical and psychological injuries to Jane Doe.

133. The illegal, wrongful and negligent acts committed by defendants Emerson College, Pelton, Ludman, Haden, Mastronardi, Marcella, and Arno resulted in Jane Doe's her persistent pain and suffering that arose from the fear, guilt, anxiety, and embarrassment she suffered in the absence of the school's support, and in the face of the school's manifest disregard of the duties it owed to her.

134. Jane Doe endured months of pain and suffering following the attack, which was caused by Emerson College's blatant indifference towards her, and towards its obligations both prior to and after the attack occurred and the complaint was filed.

135. By reason of the above, Jane Doe was subjected to conscious pain and suffering, loss of the educational opportunities, and loss of earning capacity caused by Emerson College from the day she reported the assault to the school in October 2012 to the present.

## COUNT III
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS AGAINST DEFENDANTS EMERSON COLLEGE, PELTON, LUDMAN, HADEN, MASTRONARDI, MARCELLA, AND ARNO

136. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 135 of this Complaint as if more fully set forth below.

137. The elements of a claim of negligent infliction of emotional distress are:

1. The defendant engaged in negligent conduct or a willful violation of a statutory standard;
2. The plaintiff suffered serious emotional distress;
3. The defendant's negligent conduct or willful violation of statutory standards was a cause of the serious emotional distress.

138. Emerson College engaged in negligent conduct, when the defendants collectively

breached their duty to not only implement adequate policies designed to protect Emerson College's students, but also to enforce those published guidelines, codes, regulations, and policies.

139.    Emerson College also engaged in negligent conduct when they breached their duty to protect their students from sexual assault. The College's own publications acknowledge that sexual assaults at colleges are foreseeable circumstances, and that a student may be unable to consent to sexual conduct due to coercion or voluntary or involuntary alcohol or drug use. However, the College and its' administrators failed to take the necessary precautions to safeguard and protect their students.

140.    Emerson College and defendants Pelton, Ludman, Haden, Mastronardi, Marcella, and Arno willfully violated the statutory standards laid out in Title IX, and negligently mishandled Doe's sexual assault claim by not conducting a proper investigation done by an experienced Title IX investigator, victimizing Doe, failing to adhere to the School's own procedures, and failing to properly sanction the rapist.

141.    Doe suffered emotional stress, and the post traumatic emotional stress was so serious that a reasonable person would not have been able to cope with the mental distress caused by the circumstances. In fact, Doe attempted to take her own life.

142.    The defendants' collective negligence and willful violations of Title IX caused Doe to suffer this emotional distress.

143.    The illegal, wrongful and negligent acts committed by defendants Emerson College, Pelton, Ludman, Haden, Mastronardi, Marcella, and Arno resulted in Jane Doe's her persistent pain and suffering that arose from the fear, guilt, anxiety, and embarrassment she suffered in the absence of the school's support, and in the face of the school's manifest

disregard of the duties it owed to her.

144.    Jane Doe endured months of pain and suffering following the attack, which was caused

by Emerson College's blatant indifference towards her, and towards its obligations both prior

to and after the attack occurred and the complaint was filed.

145.    By reason of the above, Jane Doe was subjected to conscious pain and suffering caused

by Emerson College from the day she reported the assault to the school in October 2012 to

the present.

## COUNT IV
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST DEFENDANTS EMERSON COLLEGE, PELTON, LUDMAN, HADEN, AND ARNO.

146.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 145 of

this Complaint as if more fully set forth below.

147.    The elements of a prima facie case for the tort of intentional infliction of emotional
distress are:

1. outrageous conduct by the defendant;
2. the defendant's intention of causing or reckless disregard of the probability of
causing emotional distress;
3. the plaintiff's suffering severe or extreme emotional distress; and
4. actual and proximate causation of the emotional distress by the defendant's
outrageous conduct.

148.    Emerson College's response to Jane Doe's complaint was outrageous, insensitive, and

humiliating. They not only allowed untrained investigators, Defendants Arno and Marcella to

handle the process, but Emerson College also never even conducted a hearing to adjudicate

Doe's claims.

149.  The Defendants dismissed Doe's complaints as frivolous, violated her privacy rights,

failed to conduct interviews, accused Doe of not knowing if it was really rape or that it was

even Student A that assaulted her, told Doe she should leave school until her alleged attacker

graduated, and even called her actions a "threat to the Emerson College community."

150.     The extreme and outrageous conduct of the Defendants was sufficiently insensitive as to intentionally cause Jane Doe severe emotional distress.

151.      Given the severity of the assault, circumstances are such that emotional distress was substantially certain to occur from the failure of the Defendants to respond to Sarah's complaint in any meaningful way.

152.     As a result, Jane Doe suffered severe emotional distress and was damaged to the point that she attempted to take her own life, and sought outside medical treatment.

153.     The wrongful and intentional acts committed by the Defendants resulted in Jane Doe's subsequent pain and suffering which arose from the fear, guilt, anxiety, and embarrassment she suffered in the absence of the school's support, and in the face of the school's manifest disregard of the duties it owed to her.

154.     Jane Doe endured months of pain and suffering following the attack, and that suffering continues today.

155.     By reason of the above, Jane Doe was subjected to conscious pain and suffering caused by Emerson College from the day she reported the attack to Emerson College on October 2012. That pain and suffering has continued even while Jane Doe has been in Washington D.C.

156.      Defendants Emerson College, Pelton, Ludman, Haden, Mastronardi, Marcella and Arno acted with actual malice, or so recklessly or wantonly to permit the inference of malice, to establish punitive damages.

**WHEREFORE,** Plaintiff requests that this Court

> 1.   Award to the Plaintiff compensatory and punitive damages resulting from her pain and suffering resulting from the Defendants' deliberate indifference.

2.  Award to the Plaintiff reasonable attorney's fees and costs expended in this

    manner; and

3.  Award to the Plaintiff such other relief as it deems just and proper.

The Plaintiff,
By Her Attorney,

*/s/ David P. Angueira*
David P. Angueira
BBO# 019610
Swartz & Swartz
10 Marshall Street
Boston, MA 02108
617-742-1900
Date: December 31, 2014                       617-367-7193