# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____
)
**JANE DOE,**                                          )
                                                       )
          **Plaintiff,**                               )
                                                       )          **Civil Action No.**
          **v.**                                       )          **14-14752-FDS**
                                                       )
**EMERSON COLLEGE;**                                   )
**LEE PELTON, individually and as**                    )
**President of Emerson College;**                      )
**RONALD LUDMAN, individually and as**                 )
**Dean of Emerson College;**                           )
**DAVID HADEN, individually and as**                   )
**Director of Housing and Residence Life;**            )
**DANIELLE MASTRONARDI, individually and**             )
**as Residence Director;**                             )
**KIM MARCELLA, individually and as**                  )
**Title IX investigator;**                             )
**and MICHAEL ARNO, individually and as**              )
**Title IX investigator,**                             )
                                                       )
          **Defendants.**                              )
_____)

## MEMORANDUM AND ORDER ON DEFENDANTS'
## MOTION FOR JUDGMENT ON THE PLEADINGS

**SAYLOR, J.**

This is an action arising out of a college's investigation of an alleged sexual assault.

Plaintiff Jane Doe is a student at Emerson College in Boston, Massachusetts. She alleges that

she was sexually assaulted off-campus, once at a party in Cambridge and later in a Boston

alleyway.

Doe originally reported to Emerson officials and police that she was raped by a male MIT

student at an MIT fraternity party. The complaint acknowledges that a DNA test was performed

after the alleged assault, and that the evidence did not support her claim. The test did, however,

show the presence of female saliva.  More than a month after Doe first reported the assault, she

changed her account to allege that a female Emerson student held her down while the MIT

student raped her, and that the female student also performed oral sex on her.  Emerson

investigated Doe's allegations; the investigation concluded that there was insufficient evidence

of a sexual assault to satisfy a preponderance of the evidence standard.

The complaint further alleges that the same two individuals later confronted her on a

Boston street and pushed her into an alleyway, where the female grabbed at her crotch.  Emerson

investigated that allegation, as well, and concluded that the claim was not supported by a

preponderance of the evidence.

The complaint alleges that the defendants, Emerson and certain of its employees, failed to

promptly and appropriately investigate the alleged assaults, subjecting Doe to a hostile

environment and effectively denying her access to educational opportunities.  The complaint

names Emerson and six employees—including the President and Dean of Students—and

includes four claims:  (1) violation of Title IX of the Educational Amendments of 1972, 20

U.S.C. § 1681, against Emerson; (2) negligence against all defendants; (3) negligent infliction of

emotional distress against all defendants; and (4) intentional infliction of emotional distress

against Emerson and four employees.  The Court previously denied Emerson's motion for

judgment on the pleadings as to the Title IX claim (Count One).  The Court also previously

granted Emerson President Lee Pelton's motion for judgment on the pleadings because the

complaint did not include any specific allegations against him.

Pending before the Court is defendants' motion for judgment on the pleadings as to Doe's

state-law claims (Counts Two through Four).  For the reasons that follow, the motion will be

granted.

## I.     Background

The facts are drawn predominantly from the complaint, and also occasionally from the

answer to provide context.  *See R.G. Fin. Corp. v. Vergara-Nunez*, 446 F.3d 178, 182 (1st Cir.

2006) (answer and other documents fairly incorporated in the pleadings may be considered for

Rule 12(c) motion).

### A.     Factual Background

#### 1.     The Parties

Emerson College is a private college in Boston, Massachusetts.  (Compl. ¶ 2).  Jane Doe

is a resident of Washington, D.C. and a student at Emerson.  (*Id.* at ¶¶ 1, 96).  She enrolled at

Emerson as a first-year student beginning with the fall 2012 semester.  (*Id.* at ¶ 17).

Lee Pelton is the President of Emerson.  (*Id.* at ¶ 3).  Ronald Ludman is the Dean of

Students.  (*Id.* at ¶ 4).  David Haden is the former Associate Dean and Director of the Office of

Housing and Residence Life.  (*Id.* at ¶ 5).  Danielle Mastronardi is a former Resident Director.

(*Id.* at ¶ 6).  Kim Marcella is the Director of Employment and Employee Relations.  (*Id.* at ¶ 7).

Michael Arno is the Director of Student Conduct.  (*Id.* at ¶ 8).

#### 2.     The Alleged Rape

On October 13, 2012, Doe and several other Emerson students, including a female

student ("Student A"), left campus to attend an off-campus party in Cambridge.  (*Id.* at ¶ 22).

The party was at a fraternity at the Massachusetts Institute of Technology.  (*Id.*).  The complaint

alleges that Student A had served Doe an alcoholic drink before the party that contained an

unknown drug.  (*Id.* at ¶ 20).

According to the complaint, while at the party, Doe was lured into a room by an MIT

fraternity member who slammed her head against the wall and raped her.  (*Id.* at ¶¶ 25-27).

When she returned to her dorm later that night, Doe told a friend that she was sexually assaulted by an MIT student at an off-campus party.  (*Id.* at ¶ 29).  Doe's friend contacted an Emerson Resident Assistant.  (*Id.* at ¶ 30).  The RA immediately went to Doe's room, spoke to her, explained to her that she had the option to file a report with the Emerson Police Department, and offered to accompany her to the police and call a counselor.  (*Id.* at ¶¶ 31-32).

Doe chose not to report the assault that night to the police.  (*Id.* at ¶ 32).  The RA explained to Doe that she would not disclose her account of the assault, except to share it with the on-duty Residence Director in order to ensure that Doe received the assistance she needed.  (*Id.* at ¶ 31).

The next day, Residence Director Mastronardi visited Doe and offered her resource materials for victims of sexual assault.  (*Id.* at ¶ 33).  The complaint alleges that Mastronardi asked Doe in "a condescending and disrespectful way" whether she was sure that she had been raped.  (*Id.* at ¶ 36).  She also failed to hide the sexual-assault resource materials from Doe's roommate.  (*Id.* at ¶¶ 34-36).  Mastronardi left the materials with Doe.  (*Id.* at ¶ 37).  According to the complaint, those materials did not provide information on Doe's rights under Title IX.  (*Id.*).

After consulting a friend later that day, Doe decided to report the assault to the Emerson police.  (*Id.* at ¶ 39).  The RA accompanied Doe to the Emerson Police office, where she reported the assault.  (*Id.* at ¶ 40).  The Emerson police explained that they did not have the power to investigate a sexual assault by a non-Emerson student at an off-campus location.  (*Id.* at ¶¶ 43-44).  The Emerson police contacted the Boston Police Department, who concluded that the Cambridge Police Department had jurisdiction.   (*Id.*).

### 3.     The Initial Police Investigation

On October 15, 2012, Doe went to Tufts Medical Center, where she received a rape kit. (*Id.* at ¶ 45).  Later that day, Doe searched online for the name of the fraternity house where she was assaulted.  (*Id.* at ¶ 46).  According to the complaint, she looked at pictures of its members and recognized one of the fraternity members as her assailant, and notified her RA.  (*Id.* at ¶¶ 46-47).  The RA notified the Cambridge police that Doe was able to identify her assailant and e-mailed the fraternity's webpage to the detective investigating the matter.  (*Id.* at ¶ 48).

A few days later, Cambridge police interviewed Doe and other Emerson students who attended the party, including Student A.  (*Id.* at ¶ 49).

During a November 15 meeting with Cambridge and MIT police, the officers told Doe that the lab results from her rape kit showed no DNA evidence to support her claim that a male MIT student sexually assaulted her.  (*Id.* at ¶ 50).  The officers also told her, however, that the results showed traces of a female's saliva.  (*Id.*).

According to the complaint, fifteen minutes after the officers left the meeting, Doe "started having an anxiety attack mixed with flashbacks of that night."  (*Id.* at ¶ 51).  For the first time, she recalled that Student A was present in the room while she was assaulted.  (*Id.*).  Doe now remembered that Student A performed oral sex on her and held her down while the MIT student raped her.  (*Id.*).  The complaint alleges that Doe did not recall Student A's involvement before November 15 because she had been drugged by Student A and because her assailant had slammed her head against the wall.  (*Id.* at ¶ 27).  At some point, Doe, traumatized by the memories of the assault, attempted suicide and was hospitalized for two days at Tufts Medical Center.  (*Id.* at ¶ 53).

Doe did not notify Emerson officials at that time of Student A's potential involvement in the assault.

### 4.   Emerson's Investigation of the Initial Assault

Doe took a leave of absence from Emerson.  (*Id.* at ¶ 54).  She then returned to school in December 2012 and met with Haden to discuss her attempted suicide.  (*Id.*).  At the meeting, Doe informed him of Student A's involvement in the assault.  (*Id.*).  It was the first time that any Emerson official had been advised of that allegation by Doe.  The complaint alleges that Haden "discouraged Doe from formally reporting Student A's role in the rape," told her to "control her allegations" and keep it a "private matter," and "failed to explain the [school's] complaint process."  (*Id.* at ¶ 55).  Nonetheless, after the meeting, Emerson assigned Arno and Marcella to investigate Doe's report.  (*Id.* at ¶¶ 62-64).

Student A lived on the same floor as Doe.  (*Id.* at ¶ 56).  On December 14, 2012, Doe informed Residence Director Caitlin Courtney that she wanted Student A moved off her floor.  (*Id.* at ¶ 57).  Courtney told Doe that she could not move Student A unless Doe filed a formal complaint.  (*Id.*).  After her meeting with Courtney, Doe filed a complaint but decided to drop the criminal investigation.  (*Id.* at ¶ 61).

When Doe returned from winter vacation in January 2013, Doe met with Arno and Courtney.  Doe told Arno "the whole story," and Arno responded, "we will get this figured out."  (*Id.* at ¶ 63).  In February, Arno and Marcella interviewed Doe about the night of the assault as part of Emerson's investigation under Title IX.  (*Id.* at ¶ 64).  Among other things, they asked her "what she was wearing the night of the assault, her relationship with Student A prior to the assault, and what she believed happened the night of her assault."  (*Id.*).  According to the complaint, Doe felt as if "she was being judged by what she was wearing" during the meeting,

and she became upset.  (*Id.* at ¶ 65).  The complaint alleges that Arno and Marcella "sternly

asked her to leave the room and come back" when she could "control her emotions."  (*Id.*).  They

also told her "[w]e can't do an unbiased investigation if you are emotional."  (*Id.*).

According to Emerson, after the February 2013 meeting, the investigation continued with

interviews of Student A and seven witnesses who were with Doe or Student A on the night of the

assault.  (Answer Ex. A at 1-2).  As part of the investigation, Emerson administrators asked Doe

to provide them with copies of her medical records and the Cambridge police report; Doe did not

do so.  (*Id.* at 2).  On February 19, Arno and Marcella orally informed Doe that absent new

evidence, Emerson would not take disciplinary action against Student A because Doe's

allegations were not supported by a preponderance of the evidence collected during the

investigation.  (*Id.*).

## 5. Emerson's Investigation of the Communications and the Second Alleged Assault

Doe alleges that from February through April 2013 she received anonymous threatening

text messages and e-mails that she believed were sent by someone who was present during the

assault.  (Compl. ¶¶ 72, 77, 80-82).[1]  Arno told Doe that Emerson would attempt to trace the

messages, and Emerson began another investigation.  (*Id.* at ¶ 72).

On February 20, 2013, Emerson issued a no-contact directive that prohibited Student A

---

[1] One text message read:  "Haha Give up already.  I am never going to get caught and neither is MIT
Student.  No one believes you and never will.  You are a dirty girl."  Another read:  "You Suck. Give up Already.
Stop F****** Trying, no one believes you.  Your[e] a dirty little slut.  MIT Student knows it, I know it, and
everyone knows it."  Another read:  "You are a f****** bitch.  Go die.  I wish you died last time you tried.  You are
not going anywhere with this so stop trying."  (Compl. ¶ 72).

One e-mail read:  "Hey whore, So I have been drinking all weekend with those little friends of yours and
found myself at this party at the Delta Kappa Epsilon Frat house, Where MIT Student and I f****** you, remember
haha?  Make any more noise about that night and I will kill you.  You were asking for it, and I know you enjoyed it.
You were a stupid virgin and now have something to be grateful for so start respecting me and MIT Student. Go to
Hell Bitch. Love, C."  (*Id.* at ¶ 81).

from contacting Doe in any manner.  (*Id.* at ¶ 76; Answer ¶ 76).  According to Emerson, in the course of the investigation, Emerson representatives learned that they could not trace the source of the messages because they were sent through free services that allowed a user to send messages anonymously without entering billing information.  (Answer Ex. A at 2-3, 4-5).

     According to the complaint, on March 1, 2013, Doe was walking on a street in Boston when she saw the MIT student and Student A.  (Compl. ¶ 69).  They followed her and pushed her into an alley, where Student A "grabbed at Doe's crotch to simulate digital penetration."  (*Id.* at ¶¶ 69-70).  Doe reported the incident to Emerson police that day; she then traveled to Florida the next morning for spring vacation.  (*Id.* at ¶ 70).

     While Doe was in Florida, Ludman called Doe's mother and allegedly informed her of the assault. (*Id.* at ¶ 71).  Ludman allegedly told Doe's mother that "he believed it would be best if Doe 'took time off' and returned to campus after Student A graduated."  (*Id.*).  According to the complaint, that was a suggestion that Doe "should not proceed with her complaint."  (*Id.*).

     Emerson, however, in fact conducted an investigation of the March 1 incident.  (*Id.* at ¶¶ 73, 83).  When students began returning from vacation on March 8, Emerson extended the no-contact directive to prohibit Student A from entering Doe's residence hall.  (*Id.* at ¶ 76; Answer ¶ 76).

     The investigation included interviews of Doe and Student A.  (Answer ¶ 74).  According to Emerson, the college eventually concluded that Student A had been traveling out of state at the time of the alleged incident on March 1.  (Answer Ex. A at 3-4).[2]

     On March 22, 2013, Doe notified Emerson that a student had left an offensive note about

---

[2] According to Emerson, in her report to campus police, Doe stated that the time of the incident was 3:30 p.m.  (Answer Ex. A at 3).  During her meeting with Arno and Marcella, Doe stated that the incident occurred between 1:45 p.m. and 2:15 p.m.  (*Id.*).  According to Emerson, Student A provided a signed statement and offered other evidence that she was not in Boston during either time period.  (*Id.*).

her on a couch in her residence hall.  (Compl. ¶ 78).  According to the complaint, Emerson investigated the note and confirmed that Student A had written it, but did not take any action. (*Id.* at ¶ 79; Answer Ex. A at 4).  Emerson concluded that another student left the note in Doe's residence hall and took no disciplinary action against Student A.  (Answer Ex. A at 4).

On May 2, Emerson notified Doe that based on its investigation, her allegations against Student A were not supported by the preponderance of the evidence.  (Compl. ¶ 83).  As a result, Emerson did not pursue disciplinary charges against Student A, and it held no hearing on the matter.  (*Id.*).

On October 18, 2013, Doe, along with two other Emerson students, filed a Title IX complaint against Emerson with the Department of Education.  (*Id.* at ¶ 86).  On the same day, Doe requested that Emerson reopen the investigation and bring disciplinary charges against Student A.  (*Id.* at ¶ 87).  Ludman reviewed Doe's request and notified her that there was no basis to reopen the investigation unless she submitted new evidence.  (*Id.*).

In the spring of 2014, Doe took a two-week leave of absence from Emerson due to her "increasing suicidal thoughts and depression."  (*Id.* at ¶ 88).  At some point, she attempted suicide again.  (*Id.*).

During the fall of 2014, Doe participated in Emerson's Washington semester program. (*Id.* at ¶ 90).  After Doe attempted suicide again in September 2014 while in Washington, Ludman spoke with Doe multiple times by phone to discuss, among other things, whether she needed to take an extended leave of absence or leave Emerson entirely.  (*Id.* at ¶¶ 95, 97).  Doe remained enrolled in the Washington program.  (*Id.* at ¶ 96).

**B.**  **Procedural Background**

Doe brought this action on December 31, 2014.  The complaint alleges claims for

(1) violation of Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, against

Emerson (Count One); (2) negligence against all defendants (Count Two); (3) negligent

infliction of emotional distress against all defendants (Count Three); and (4) intentional infliction

of emotional distress against Emerson, Pelton, Ludman, Haden, and Arno (Count Four).  The

defendants have filed a joint motion for judgment on the pleadings as to all four counts.

The Court previously granted the motion as to President Pelton because the complaint

does not include any allegations specifically directed to him.  The Court previously denied

Emerson's motion as to Count One.  Accordingly, the issues pending before the Court are

whether the defendants are entitled to judgment on the pleadings on Doe's claims for negligence,

negligent infliction of emotional distress, and intentional infliction of emotional distress.

## II.    <u>Legal Standard</u>

A Rule 12(c) motion for judgment on the pleadings "is treated much like a Rule 12(b)(6)

motion to dismiss."  *Perez-Acevedo v. Rivero-Cubano*, 520 F.3d 26, 29 (1st Cir. 2008).  It differs

from a Rule 12(b)(6) motion primarily because it is filed after the close of pleadings and

"implicates the pleadings as a whole."  *Aponte-Torres v. University of P.R.*, 445 F.3d 50, 54-55

(1st Cir. 2006).  To survive a motion for judgment on the pleadings, a plaintiff "must state a

claim that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The

plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer

possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Because a Rule 12(c) motion "calls for an assessment of the merits of the case at an

embryonic stage, the court must view the facts contained in the pleadings in the light most

favorable to the nonmovant and draw all reasonable inferences therefrom to the nonmovant's

behoof."  *R.G. Fin. Corp. v. Vergara-Nunez*, 446 F.3d 178, 182 (1st Cir. 2006).  The court may

supplement the facts contained in the pleadings by considering documents fairly incorporated therein and facts susceptible to judicial notice.  *See id.*; *see also In re Colonial Mortg. Bankers Corp.*, 324 F.3d 12, 15-16 (1st Cir. 2003) (recognizing this principle in the Rule 12(b)(6) context).  There is no resolution of contested facts in connection with a Rule 12(c) motion; a court may enter judgment on the pleadings only if the properly considered facts conclusively establish the movant's position.  *Rivera-Gomez v. de Castro*, 843 F.2d 631, 635 (1st Cir. 1988).

## III.   Analysis

### A.   Count Two:  Negligence

Count Two alleges that Emerson and the individual defendants were negligent in failing to implement and enforce school regulations designed to protect students like Doe from being sexually assaulted.  The Court will address the claim of negligence against Emerson before turning to the claims against the individual defendants.

#### 1.   Emerson

The complaint alleges that Emerson "through its school publications, acknowledged and accepted its duty to protect its students . . . and to provide a safe environment for them." (Compl. ¶ 124).[3]  It further alleges that Emerson's "own publications acknowledge that sexual assaults at colleges are foreseeable circumstances . . . [and that] a student may be unable to consent to sexual conduct due to coercion or voluntary or involuntary alcohol or drug use."  (*Id.* at ¶¶ 126-27).  It alleges that Emerson breached its duty to Doe by "failing to take reasonable precautions to safeguard its students"—including more strict enforcement of its alcohol policy— and by "failing to follow the school's guidelines with respect to responding to reported sexual assaults perpetrated by Emerson students."  (*Id.* at ¶¶ 128-29).  Emerson contends that it is

---

[3] Doe has not cited any specific Emerson policies, procedures, or publications in her complaint, nor has she attached any as exhibits.

entitled to judgment on the pleadings because the complaint does not identify a legal duty that it

breached, nor does it identify reasonable precautions that it failed to take.

In any negligence case, a plaintiff must prove (1) a legal duty owed by defendant to

plaintiff; (2) a breach of that duty; (3) proximate or legal cause; and (4) actual damage or injury.

*See, e.g.*, *Jorgensen v. Massachusetts Port Auth.*, 905 F.2d 515, 522 (1st Cir. 1990) (applying

Massachusetts law).  Ordinarily, a person "do[es] not owe others a duty to take action to rescue

or protect them from conditions [h]e ha[s] not created."  *Cremins v. Clancy*, 415 Mass. 289, 296

(1993).  However, § 314A of the Restatement (Second) of Torts expressly recognizes that there

exist "special relationships" that give rise to a duty to act or to protect a person where otherwise

no duty would exist:

> This Section states exceptions to the general rule, stated in § 314 that the fact that
> the actor realizes or should realize that this action is necessary for the aid and
> protection of another does not in itself impose upon him any duty to act.  The
> duties stated in this Section (common carrier, innkeeper, land owner, one who is
> required by law or voluntarily takes custody of another) arise out of special
> relationships between the parties, which create a special responsibility, and take
> the case out of the general rule.  The relations listed are not intended to be
> exclusive, and are not necessarily the only ones in which a duty of affirmative
> action for the aid or protection of another may be found.

Restatement (Second) of Torts § 314 (1965).

To the extent that Doe's negligence claim rests on the contention that Emerson owed her

a duty to prevent the consumption of alcohol or use of drugs by herself or other students,

Emerson is entitled to judgment on the pleadings.  Massachusetts does not impose a legal duty

on colleges or administrators to supervise the social activities of adult students, even though the

college may have its own policies prohibiting alcohol or drug abuse.  *See Bash v. Clark Univ.*,

2006 WL 4114297, at *5 (Mass. Super. Nov. 6, 2006) (imposing no duty on a college to protect

a first-year student from overdosing on heroin even where the school had a policy against illegal

drug possession).  Imposing such an affirmative duty on colleges would be impractical and unrealistic.  To say the least, it is unclear how Emerson could reasonably prevent its own students from consuming alcohol, never mind how it would prevent consumption by persons with whom it had no relationship at all.  *See id.* (noting that the tragic consequences of a student's voluntary overuse of drugs or alcohol are not reasonably foreseeable because "a university cannot prevent these incidents from occurring except possibly by posting guards in each dorm room on a 24-hour, 365-day per year basis" (citation omitted)).

The alleged sexual assault on October 13, 2012, occurred at an MIT fraternity.  To the extent that Doe's negligence claim rests on the premise that Emerson had a legal duty to protect her from the criminal acts of her alleged assailants at the party, Emerson is also entitled to judgment on the pleadings.  "[A]s a general rule, there is no duty to protect another from the criminal conduct of a third party" unless (1) there is a special relationship between the defendant and the injured victim, and (2) the criminal conduct is reasonably foreseeable.  *Kavanaugh v. Trustees of Boston Univ.*, 440 Mass. 195, 201 (2003); *see also Mullins v. Pine Manor Coll.*, 389 Mass. 47, 54-55 (1983) (finding a duty for the college to provide physical security measures like additional security guards to prevent foreseeable sexual assaults by trespassers because there were "dangers inherent in being housed at a women's college near a metropolitan area only a short distance from bus and train lines").  As a general matter, Emerson owed a special duty to Doe as a student housed in a facility on its campus.  However, under the circumstances presented here, that duty did not extend so far as to require Emerson to protect her when she voluntarily left the campus and attended a party that was not affiliated in any way with Emerson.

Furthermore, even assuming that Emerson should have been aware as a general matter that its students may be subject to sexual assaults, it does not follow that Emerson could

reasonably be expected to anticipate and prevent a sexual assault occurring at an off-campus

party.  Emerson does not provide security or supervision at MIT fraternities, nor could it.

Moreover, the complaint does not appear to allege that Emerson should have known, or

reasonably could have known, that the MIT student or Student A posed a danger to Doe, at least

before Doe reported the incident.  *See Kavanaugh*, 440 Mass. at 203-04 (noting that a negligence

claim based on the criminal conduct of a third party must include "specific

information . . . suggesting a propensity" for harmful conduct of which the defendant should

have been aware).  If there were reasonable additional steps that Emerson should have taken to

prevent the assault, the complaint does not identify them.

The alleged sexual assault on March 1, 2013, also occurred off-campus, in a Boston

alleyway.  As noted, Emerson investigated the alleged assault, and concluded that there was

insufficient evidence to sustain the claim.  Again, the complaint does not allege what actions

Emerson should have reasonably taken to prevent the assault, even assuming the truth of the

allegation.  For example, even if Emerson had expelled Student A from school, it is unclear how

that would have kept her from later assaulting Doe on a city street.  Surely Emerson is not

required to provide its students with round-the-clock police protection, even when walking off-

campus on public streets.  Again, if Emerson reasonably should have taken any additional steps

to prevent the assault, these steps are not set forth in the complaint.

Accordingly, Emerson's motion for judgment on the pleadings will be granted as to

Count Two.

### 2.   <u>Individual Defendants</u>

The complaint alleges that the individual defendants, as administrators, owed a "duty to

implement and enforce the school's published guidelines, codes, regulations, and policies

designed to protect [Emerson] students." (Compl. ¶ 125). The complaint also alleges that the defendants breached that duty by "fail[ing] to take reasonable precautions to safeguard [Emerson] students." (*Id.* at ¶ 128).

Massachusetts does not, however, impose a common-law or statutory duty on administrators to enforce university policies. *See Bash*, 2006 WL 4114294, at *5. Furthermore, and in any event, the complaint fails to allege specific acts of negligent conduct by the individual defendants. In fact, the complaint barely mentions the individual defendants at all.

The complaint mentions Haden and Mastronardi once. Its only reference to Haden purports to summarize a meeting that he held with Doe in December 2012 after her three-week leave of absence. That meeting was the first time that Doe told an Emerson administrator that Student A had been involved in the assault. Haden allegedly failed to explain the sexual-assault complaint process after Doe told him that she wanted to open a formal investigation. But Emerson did, in fact, immediately begin an investigation, and assigned Marcella and Arno as Title IX investigators.

The complaint's only reference to Mastronardi is the allegation that she went to Doe's room the day after the alleged assault to speak to her and provide her with resource materials for sexual-assault victims. The complaint alleges that Mastronardi was disrespectful and failed to provide information on Doe's Title IX rights. But the complaint itself states that Mastronardi offered to discuss the resource materials with Doe and left them with her to review. Those allegations against Haden and Mastronardi fail to allege specific negligent conduct that breaches a legal duty, or even comes close to doing so.

The complaint refers to Ludman only three times. The first reference describes a March 2013 phone call with Doe's mother during which Ludman allegedly told her of the assault and

discussed a potential leave of absence.[4]   The second reference alleges that Ludman denied Doe's request to reopen the investigation in October 2013 unless she could provide new evidence of Student A's involvement.   The third reference alleges that Ludman suggested to Doe that she should consider a leave of absence after she attempted to commit suicide during her semester in Emerson's Washington program.   Those three allegations, however, individually or taken as a whole, do not describe how Ludman's conduct was negligent and how it breached a legal duty.

Finally, the complaint's allegations against Arno and Marcella as Title IX investigators appear to be based on Doe's dissatisfaction with the investigation process, rather than any specific negligent conduct.   The complaint first refers to Arno and Marcella in summarizing a February 2013 interview with Doe that was part of Emerson's investigation.   The complaint alleges in substance that they were insensitive to Doe's emotions and seemed judgmental.   The complaint also alleges that Arno and Marcella failed to trace the anonymous messages, and that their explanation for the failure was that the sender used third-party services to hide source-identifying information.   In sum, it appears that the complaint's allegations against Arno and Marcella amount to mere dissatisfaction with the investigation's conclusion; they fail to identify what specific actions by the defendants were negligent and how they breached a legal duty.

Accordingly, the individual defendants' joint motion for judgment on the pleadings will be granted as to Count Two.

---

[4]   According to the complaint, at the time Ludman allegedly disclosed the information to Doe's mother, Doe had already attempted suicide once (she would do so again twice).   Under regulations promulgated under the Family Educational Rights and Privacy Act of 1974, a college "may disclose personally identifiable information from an education record to appropriate parties, including parents of an eligible student, in connection with an emergency if knowledge of the information is necessary to protect the health or safety of the student."   34 C.F.R. § 99.36(a); *see also Doe v. Woodford Cty. Bd. of Educ.*, 213 F.3d 921, 926-27 (6th Cir. 2000).   Doe's suicide attempt and apparent suicidal tendencies would surely justify such a disclosure to her own mother under the circumstances presented here.   In any event, the disclosure of such private information to a parent, without more, does not state a claim for common-law ordinary negligence.

**B.      Count Three:  Negligent Infliction of Emotional Distress**

The complaint alleges a claim for negligent infliction of emotional distress against

Emerson and the individual defendants.  To state a claim for negligent infliction of emotional

distress under Massachusetts law, the complaint must plausibly allege "(1) negligence; (2)

emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology;

and (5) that a reasonable person would have suffered emotional distress under the circumstances

of the case." *Payton v. Abbott Labs*, 386 Mass. 540, 557 (1982).  Although Massachusetts courts

have broadened the definition of physical harm, they have not eliminated the requirement, but

instead have merely "expanded the range of symptoms that may provide the type of objective

evidence to prove physical harm to include symptoms that could be classified as more 'mental'

than 'physical.'" *Gutierrez v. Mass. Bay Transp. Auth.*, 437 Mass. 396, 412 (2002).

The complaint fails to state a claim for negligent infliction of emotional distress for two

reasons.  First, the claim rests on the same allegations underlying the negligence claim; the

complaint does not allege any additional negligent acts that caused her emotional distress.

Because the Court has indicated that the defendants are entitled to judgment on Doe's negligence

claim, her claim for negligent infliction of emotional distress must also fail.  *See Urman v. South

Boston Savings Bank*, 424 Mass. 165, 171 (1997) (affirming summary judgment on plaintiff's

negligent infliction of emotional distress claim because the defendant "did not owe a duty and

did not engage in conduct that would warrant a finding of negligence").  Second, the complaint

does not sufficiently allege any physical harm manifested by objective symptoms that was

caused by Doe's emotional distress.  The complaint alleges that the defendants' negligence

caused her "pain and suffering" without any description or explanation of how that emotional

distress has manifested in physical symptoms.  (Compl. ¶¶ 133-35).  Without such allegations,

the complaint fails to state a claim for negligent infliction of emotional distress and the

defendants are entitled to judgment on the pleadings.  *See Sullivan v. Boston Gas Co.*, 414 Mass.

129, 137 (1993) (reaffirming the requirement under Massachusetts law that plaintiffs "must do

more than allege mere upset, dismay, humiliation, grief and anger" and instead "must

corroborate their mental distress claims with enough objective evidence of [physical] harm to

convince a judge that their claims present a sufficient likelihood of genuineness to go to trial");

*see also Anderson v. W.R. Grace & Co.*, 628 F. Supp. 1219, 1227 n.4 (D. Mass. 1986) (denying

summary judgment for defendant because plaintiffs supported their claims for negligent

infliction of emotional distress with expert testimony indicating that their mental anguish caused

them physical ailments, including headaches and diarrhea).  Here, the complaint has alleged no

physical symptoms or conditions of any kind.

Accordingly, the defendants' motion for judgment on the pleadings will be granted as to

Count Three.

### C.    Count Four:  Intentional Infliction of Emotional Distress

The complaint alleges a claim for intentional infliction of emotional distress against

Emerson, Pelton, Ludman, Haden and Arno.  To state a claim for intentional infliction of

emotional distress under Massachusetts law, the complaint must allege:

> (1) that the actor intended to inflict emotional distress or that he knew or should
> have known that emotional distress was the likely result of his conduct; (2) that
> the conduct was extreme and outrageous, was beyond all possible bounds of
> decency[,] and was utterly intolerable in a civilized community; (3) that the
> actions of the defendant were the cause of the plaintiff's distress; and (4) that the
> emotional distress sustained by the plaintiff was severe and of a nature that no
> reasonable man could be expected to endure it.

*Agis v. Howard Johnson Co.*, 371 Mass. 140, 144-45 (1976) (citations and internal quotation

marks omitted); *accord Brown v. Hearst Corp.*, 54 F.3d 21, 27 (1st Cir. 1995); *see also Borden*

*v. Paul Revere Life Ins. Co.*, 935 F.2d 370, 380 (1st Cir. 1991).  Courts apply a "very high" standard to claims of intentional infliction of emotional distress, especially on the requirement that the conduct in question is extreme and outrageous, beyond all possible bounds of decency in a civilized community.  *See Doyle v. Hasbro, Inc.*, 103 F.3d 186, 195 (1st Cir. 1996).  For example, liability "cannot be predicated upon mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities."  *Foley v. Polaroid Corp.*, 400 Mass. 82, 99 (1987).  Even the "fact that the defendants' conduct may turn out to be violative of the plaintiff['s] civil rights does not, in and of itself, necessitate a finding that the conduct is sufficiently egregious to state a claim for intentional infliction of emotional distress."  *Guckenberger v. Boston Univ.*, 957 F. Supp. 306, 319 (D. Mass. 1997) (citing *Marques v. Fitzgerald*, 99 F.3d 1, 6-7 (1st Cir. 1996)); *see also Sinai v. New England Tel. & Tel. Co.*, 1990 WL 150015, at *5 (D. Mass. Sept. 13, 1990) (concluding that defendant's repeated denials of plaintiff's employment application based on plaintiff's religion and national origin "may have been discriminatory, but . . . were not utterly intolerable in a civilized community").

The complaint does not allege any conduct by Emerson or the individual defendants that is sufficiently extreme and outrageous to meet that high standard.  Rather, the complaint's allegations largely rest on Doe's dissatisfaction with Emerson's policies and procedures, what she perceived to be their inadequate sensitivity to her issues, and the results of the various investigations.  The defendants' conduct was neither extreme nor outrageous, and the complaint contains no additional facts that state a plausible claim for intentional or reckless infliction of emotional distress.  *See, e.g.*, *Fellheimer v. Middlebury Coll.*, 869 F. Supp. 238, 246-47 (D. Vt. 1994) ("A [c]ollege's decision, when confronted with a female student's accusation of rape, to confront the male student with the charges, hold a hearing, and support the findings of the initial

19

tribunal on appeal, even where various procedural errors are alleged, cannot form the basis of an

IIED claim.").

      Accordingly, the defendants' motion for judgment on the pleadings will be granted as to

Count Four.

**IV.**    <u>**Conclusion**</u>

      For the foregoing reasons, defendants' motion for judgment on the pleadings as to Counts

Two, Three, and Four is GRANTED.

**So Ordered.**

/s/  F. Dennis Saylor IV
F. Dennis Saylor IV
United States District Judge

Dated:  December 22, 2015