**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                                    )
**JANE DOE,**                                )
                                                    )
       **Plaintiff,**              )
                                                    )          **Civil Action No.**
       **v.**                          )          **14-14752-FDS**
                                                    )
**EMERSON COLLEGE,**              )
                                                    )
       **Defendant.**            )
_____)

**MEMORANDUM AND ORDER ON DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

**SAYLOR, J.**

      This is an action arising out of a college's response to claims of alleged sexual assault.

      Plaintiff "Jane Doe" was a student at Emerson College in Boston.  In October 2012, she alleged that she was raped by a male MIT student at an off-campus party in Cambridge.  The incident was investigated by the Cambridge Police Department; Emerson itself did not conduct an investigation, because the alleged perpetrator was not an Emerson student and the incident did not occur on campus.  Emerson, however, immediately offered or provided Doe a variety of counseling and other support services.

      In November 2012, the Cambridge Police determined that there was no probable cause to bring charges against the MIT Student when the forensic evidence and witness testimony did not appear to support Doe's allegations.

      In December 2012, Doe alleged for the first time that a female Emerson student had also participated in the off-campus sexual assault.  Emerson officials again provided support resources, and—because an Emerson student had now been accused—began conducting its own

investigation.  Emerson eventually determined that there was insufficient evidence to bring disciplinary charges against the accused female student.

In March 2013, Doe made a new allegation of sexual assault.  She reported that the male MIT student and the female Emerson student had together assaulted her in an alleyway off a Boston street in the middle of the afternoon.  The two alleged perpetrators, however, produced substantial evidence that they had not been in Boston at the time of the second claimed assault: the male MIT student was in a university infirmary in Cambridge, and the female Emerson student was in Connecticut on a bus to New York.  Moreover, there was no forensic, eyewitness, or street-video testimony to support the allegation.  The Boston Police Department conducted an investigation and concluded that there was no probable cause to bring criminal charges. Emerson officials similarly investigated and determined that there was insufficient evidence to bring disciplinary charges against the female Emerson student.

Doe has now filed this action against Emerson, asserting claims under Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681.  In substance, Doe alleges that the manner in which Emerson handled her allegations of sexual assault constituted deliberate indifference amounting to gender discrimination in violation of Title IX.

The proper resolution of this case turns on its facts—not on conclusory statements or arguments, not on politics or rhetoric, and not on generalities or stereotypes.  The issue is not how other sexual assault cases have been handled in other jurisdictions under other circumstances.  Nor is it how college administrators typically respond to allegations of sexual assault, if there is such a typical case.  It is how *this* college responded in *this* case to *these* specific allegations, as they unfolded over the course of many months.

Furthermore, the resolution of this case does not require a determination as to exactly

what happened to Doe, if indeed anything happened at all.  This is not a lawsuit against the male

MIT Student, or the female Emerson student.  It is a lawsuit against Emerson.  The only question

presented is whether the college violated any of its duties or obligations under the law:  more

precisely, whether it was deliberately indifferent to Doe's allegations.

The evidence shows that Emerson responded immediately to all three of Doe's reports of

sexual assault; offered and provided her counseling and other support and assistance; permitted

her to take a leave of absence; assisted her in cooperating with the police; and (as to the

allegations against an Emerson student) conducted its own investigations.  The investigations

were conducted by individuals who had been trained in handling issues of sexual assault under

Title IX.  None of those facts, in their principal details, are disputed.

Nonetheless, Doe argues that certain Emerson administrators were not appropriately

sensitive during that process, discouraged her from reporting, were skeptical of her claims, or

were otherwise insufficiently supportive.  The administrators in question vigorously deny Doe's

claims.  And Doe often conflates what happened at the beginning of the process with what

happened later on, when some Emerson administrators indeed came to doubt at least some

aspects of her story.  But those disputes are not material to the resolution of this case.

Even assuming Doe's version of events is accurate, the undisputed evidence is more than

sufficient to show that Emerson fulfilled its obligations under the law.  Emerson administrators

were required to respond in a timely and reasonable manner.  They did so.  They were not

required to react exactly as Doe might have preferred, either at the time or with the benefit of

hindsight.  Nor were they required to accept all of her allegations in every detail, and at every

stage of the proceedings—particularly as they began to obtain substantial countervailing

evidence that her allegations may not have been true.  And, of course, Emerson was obligated to

protect the rights of the accused female Emerson student, and to treat her fairly, as well.

In short, the question is not whether Emerson's response was perfect in all respects, or whether it could have been improved upon; it is whether the college violated its obligations under Title IX. Emerson has moved for summary judgment, contending that the undisputed evidence shows that it did not violate those obligations. For the following reasons, that motion will be granted.

## I.    **Background**

Unless otherwise noted, the following facts are undisputed.

### A.    **Factual Background**

Emerson College is a private college located in Boston, Massachusetts. (Compl. ¶ 2). "Jane Doe" is a former Emerson undergraduate student. (Def. Tab 1 at 31-32, 343).[1]

In the fall of 2012, Doe enrolled at Emerson as a freshman. (*Id.* at 31-32). Shortly after arriving on campus, she attended Emerson's orientation and received a copy of the student handbook and undergraduate rules, regulations, and policies guide. (*Id.* at 33-34). Among other things, the handbook states that the school "will not tolerate any form of sexual violence." (Def. Tab 6 at 94). It also defines unlawful sexual conduct and describes the process for filing a complaint against the perpetrator of a sexual assault. (*Id.* at 60-61, 69-72, 95).[2] In addition to receiving that information, Doe attended an orientation program shortly after enrolling that addressed sexual harassment and sexual assault and also addressed health risks associated with consuming alcohol. (Def. Tab 1 at 32).

---

[1] References to "Def. Tab __" refer to the sealed exhibits to Defendant's Statement of Material Facts.

[2] Doe argues that the information provided by the school "blamed victims for their assaults." (Pl. Opp. to Mot. for Summ. J. at 12). She also argues that the school did not "include clear and accessible information concerning sexual assault or her Title IX rights." (*Id.*). Those arguments are made without specific citation to the record and do not appear to be supported by the evidence.

1.      **The October 2012 Incident**

During her freshman year, Doe lived in an Emerson residence hall called the Little Building.  (*Id.* at 40-41).  Shortly after moving in, she became acquainted with "Student A," who was another female student living on her floor at the time.  (*Id.* at 41-42).

On Saturday, October 13, 2012, Doe attended a "social event" in Student A's room along with a male Emerson student.  (*Id.* at 44-45).  Student A prepared a cocktail for Doe.  (*Id.* at 45-46).  When the male student tried to drink some of Doe's cocktail, Student A told him that she could make him his own drink.  (*Id.* at 46-47).  Student A told Doe that there was a party that night at a fraternity at the Massachusetts Institute of Technology in Cambridge.  (*Id.* at 49).

Later that night, Doe, Student A, and a group of other students traveled to the MIT party together.  (*Id.* at 47-48).  When they arrived, they discovered that the building was crowded and that there was a line to enter.  (*Id.* at 50-51).  While standing in line, Doe was approached by a man who was working as a doorman at the party, allowing people to enter and exit the building.  (*Id.* at 52-53).  The man told her that she could go into the party, and she entered alone.  (*Id.*).

Doe contends that shortly after entering the building, she was sexually assaulted.  (Def. Tabs 18, 29).  Her account of how that alleged sexual assault occurred has changed over time, and will be described in more detail below.

a.      **The Initial Allegation of Rape Against MIT Student**

Doe returned to Emerson at approximately 12:30 a.m. on Sunday, October 14, and asked a friend to come over.  (Def. Tab 1 at 56-57).  She told her friend that she had been sexually assaulted.  (*Id.* at 57).  Doe's friend encouraged her to report the assault, but when she declined to do so, the friend reported her allegations to Doe's resident assistant.  (*Id.* at 57-60).  That report was made at about 1:20 a.m.  (Def. Tab 10 Ex. 2).  The resident assistant met with Doe the

same night and asked if she wanted to speak with a therapist or report the incident to the

Emerson College Police Department ("ECPD").  (Def. Tab 1 at 59-62).  Doe declined the offers

of assistance and said she "wasn't interested" in reporting the incident to the police.  (*Id.* at 61-

62).

The resident assistant told Doe that she was obligated to report the incident to a resident

director.  (*Id.*).  Later that night, the resident assistant called the resident director on call,

Danielle Mastronardi, and sent an e-mail at 2:30 a.m. to Doe's own resident director, Caitlin

Courtney, to inform them of the allegations.  (Def. Tab 11 at 84; Def. Tab 10 ¶ 13).

Mastronardi visited Doe that morning.  (Def. Tab 1 at 63).[3]  Doe contends that they spoke

in the doorway of her suite; Mastronardi contends that the two went to a private area in Doe's

bedroom and shut the door.  (*Id.* at 64-65; Def. Tab 11 at 89-90, 92).  Doe told Mastronardi that

she had been raped at a party at MIT.  (Def. Tab 11 at 90).  Mastronardi gave her pamphlets and

other paper materials concerning sexual assault, and asked if Doe would like to go to the hospital

or speak with a counselor or ECPD.  (Def. Tab 1 at 66; Def. Tab 11 at 91).  Doe declined.  (Def.

Tab 1 at 66).[4]

After receiving further encouragement from her friend, Doe reported the incident to

ECPD on the night of Sunday, October 14.  (Def. Tab 1 at 86-87).  She told an ECPD officer that

a man at the MIT party had raped her.  (Def. Tab 16 at 4).  She stated that the man had invited

---

[3] Doe complains that "Mastronardi did not visit [her] room until the following morning."  (Pl. Opp. to Mot. for Summ. J. at 2).  Mastronardi testified, however, that she had received a telephone call from the resident assistant the night before at about 2:30 a.m. informing her of the incident, and that she was told that Doe "did not want to speak to anybody else" and that "she was going to bed."  (Def. Tab 11 at 84-85; Def. Tab 10 Ex. 2).

[4] Doe alleges that Mastronardi also asked "if [she] was sure that it was a sexual assault."  (Def. Tab 1 at 66).  Mastronardi denies that account and contends that she would never ask such a question.  (Def. Tab 11 at 96).  Doe also testified that Mastronardi asked "if [she] was drinking."  (Def. Tab 1 at 66).  Mastronardi testified that she "was trying to understand the situation that she had been in," and therefore "asked her if there was alcohol at the party that she was at, and if she had drank at all."  (Def. Tab 11 at 96).  Doe characterizes those questions as "victim blaming language."  (Pl. Opp. to Mot. for Summ. J. at 2).

her into a back room.  (*Id*.).  He then "threw [her] against the wall and told her she was going to have sex."  (*Id.*).  She said that "she began screaming, but due to the loud music no one could hear her."  (*Id.*).  He then "pushed her to the ground[,] striking her in the face[,] and began pulling off her clothing to have sexual intercourse."  (*Id.*).  She told the officer that the man had "put his penis in [her] vagina."  (*Id.*).  She did not say anything about anyone else participating in the assault, or being present in the room.  (*See id.*).

The ECPD officer told Doe that she could speak with a counselor, confirmed that she felt safe, and told her of her option to seek medical care.  (Def. Tab 17).  The officer also noted that Doe "had some swelling about the right eye with redness to the inner part of the right eye," and that there also "appeared to be some slight discoloration about the left forehead area above the left eye."  (Def. Tab 16 at 4).[5]  Doe testified that she was also told that rape is a serious accusation, and that she "better be sure" of what happened.  (Def. Tab 1 at 96).  According to her, the officer also informed her that she had been violating Emerson's drinking policies because she had been drinking underage.  (*Id.* at 96-97).

The MIT party did not take place on the Emerson campus.  ECPD accordingly referred the matter to the Cambridge Police Department ("CPD") as the authority with jurisdiction over the incident.  (Def. Tab 16 at 4).  Cambridge police officers interviewed Doe that evening.  (*Id.*).  Doe gave a further statement to the CPD, in which she added a few details, including a description of her attacker.  (Def. Tab 18 at 2).[6]  The CPD officers took custody of the clothing

---

[5] Cambridge police officers noticed later that evening that "[her] right eye was red and the area around the eye was swollen," and that she had "a slight bruise to her upper left forehead area by the hair line."  (Def. Tab 18 at 2).  The October 15 medical examination, described below, also noted those conditions, as well as a contusion on her right thigh.  (Def. Tab 22 at 1-2, 5-6).

[6] Among other things, Doe also told the CPD officers that the man told her, "I'm going to fuck you," and that the intercourse had lasted about five minutes.  (Def. Tab 18 at 2; *see* Def. Tab 24).

she had been wearing that night.  (*Id.* at 3).

On Monday, October 15, Doe went to Tufts Medical Center for a medical examination. Among other things, the examination included the collection of evidence of sexual assault, using vaginal swabs and other standard methods of evidence collection.  (Def. Tab 22; Def. Tab 1 at 102-04).  A pelvic examination revealed "no obvious trauma."  (Def. Tab 22 at 5).[7]  She declined an offer of counseling and other services from the Boston Area Rape Crisis Center.  (*Id.* at 9).

Later that day, Student A visited Doe in her room and told her the name of the fraternity they had visited.  (Def. Tab 1 at 122-23).  Student A suggested that they look at online photographs of members of the fraternity to identify the attacker.  (*Id.* at 123).  The two started reviewing photographs together, and Doe came across a picture of "MIT Student," who was listed as a member of the fraternity.  (*Id.*).  When she saw the photo, Doe was "100 percent" certain that MIT Student was the person who had raped her.  (*Id.* at 123).  She informed her resident assistant that she had identified MIT Student as her attacker.  (*Id.* at 124).  The resident assistant then informed the CPD.  (*Id.*).

The CPD conducted an investigation into the alleged rape.[8]  As part of its investigation, the CPD interviewed MIT Student, whom they described as cooperative.  (Def. Tab 19 at 13, 28).  He told the CPD investigator that he had been working as a doorman at the fraternity on the night of the party.  (*Id.* at 14).  He expressed shock at the accusation and denied assaulting Doe. (Def. Tab 24 at 4-5).[9]  He agreed to provide a DNA sample "to prove his innocence" and

---

[7] Doe apparently did not advise the physicians or nurses that she may have been drugged, and it does not appear that any drug testing was conducted; in any event, there are no medical records showing a positive test for any "date-rape" drugs.

[8] The CPD lead investigator testified that the Emerson police were "very cooperative" and assisted in the investigation.  (Def. Tab 19 at 50-51).

[9] MIT student told the CPD investigators that "he has never had intercourse or sex with any female in his entire life," and that "he has only kissed one female before and that was some time ago."  (Def. Tab 24 at 4).

permitted the CPD to search his room and to collect the underwear he wore that evening for examination and testing.  (*Id.* at 5; Def. Tab 19 at 28).  He also agreed to submit to a CPD booking photograph in order to include a new photograph in an array to be shown to Doe.  (Def. Tab 24 at 12; Def. Tab 19 at 42-43).

The CPD also interviewed Student A, who said that she never entered the fraternity party on the night of the incident; she told the police that she left the line to use the bathroom before gaining entrance and then decided to attend a different party.  (Def. Tab 24 at 8).

Doe and Student A had corresponded by text message after Doe left the party.  (Def. Tab 59).  The text messages indicate that Doe was in a cab, and was asking where Student A was; the messages appear to be about the possibility of attending another party.  (*Id.*).  There was no mention of a sexual assault.  (*Id.*; Pl. Resp. to Def. SMF ¶ 151).[10]

On October 22, the CPD showed Doe a photo array that included the new photo of MIT Student.  She identified MIT Student from the array "with 80% certainty."  (Def. Tab 24 at 13; Def. Tab 19 at 42).

In the course of the investigation, CPD officers interviewed various other MIT and Emerson students.  (Def. Tab 24; Def. Tab 19 at 12-13, 19-22, 120-21, 140).  There were "no witnesses to any type of struggle or dispute within the frat house," which was very crowded at the time.  (Def. Tab 19 at 27).

The CPD also sent various items to the State Police Crime Laboratory for analysis, including evidence from the examination performed at Tufts, clothes collected from Doe and MIT Student, and a portion of the carpet from the place where she was alleged to have been

---

[10] The CPD investigators also interviewed various other persons who had attended the party or who had attempted to get in.  (Def. Tab 24 at 6-10; Def. Tab 19 at 22-23).  The investigators also attempted, without success, to locate video evidence from the area.  (Def. Tab 19 at 29).

raped.  (Def. Tab 24 at 13; Def. Tab 19 at 28).  The State Police laboratory performed a variety

of tests on the evidence, including searching for traces of seminal fluid, saliva, and blood.  (Def.

Tabs 25, 26).  None of MIT Student's DNA was found on Doe's clothing or in the samples taken

in the examination at Tufts.  (*Id.*; Def. Tab 19 at 16-17).  The report was also negative for the

presence of semen and blood.  (Def. Tab 26; Def. Tab 19 at 16-17).[11]  The analysis did, however,

reveal the presence of female saliva on the vaginal swab, although there was insufficient DNA

on the swab to match the sample to a particular individual.  (Def. Tab 26; Def. Tab 19 at 17-18).

The laboratory report was provided to the CPD on October 25.  (Def. Tab 27).

Doe had stated that her clothing had been forcefully pulled off her in the course of the

assault.  (Def. Tab 16 at 4; Def. Tab 18 at 2).  The CPD, however, determined that her clothing

"wasn't ripped or torn or stretched."  (Def. Tab 19 at 27).

On November 15, Doe met with investigators from the CPD on the Emerson campus.

(Def. Tab 1 at 126; Def. Tab 19 at 140-41; Def. Tab 24 at 13).  The investigators informed Doe

that there was "no evidence or DNA located on either her Sexual Assault Kit [from the Tufts

examination] or clothing that matched with [MIT student's] DNA."  (Def. Tab 24 at 13).  The

investigators also informed Doe that "the laboratory did not locate any seminal fluid enzyme or

the presence of sperm cells in any o[f] the evidence collected" and that "none of the clothing was

noted as being torn or stretched."  (*Id.*).  The investigators discussed the lack of DNA evidence

from either Doe or MIT student, for which Doe "did not have an explanation."  (Def. Tab 19 at

29).  They also asked her about the presence of female saliva, as to which she could not "provide

any explanation of why or how that got there."  (*Id.* at 30-31).

---

[11] According to the CPD investigator, normally there would have been a transfer of physical evidence from the assailant to the victim and from the victim to the assailant, even if the assailant had worn a condom.  (Def. Tab 19 at 26-27).

The investigators advised Doe that "[their] job [was] to establish probable cause before someone can be charged," and explained to her that "[they] were not quite there." (*Id.* at 30). In the words of the lead investigator, "A lot of the things that she had alleged we couldn't confirm. The lab reports had no DNA transfer from either party, and we were at a standstill because there wasn't probable cause to charge [MIT Student]." (*Id.*).[12]

Doe testified that later that night she began having suicidal thoughts. (Def. Tab 1 at 128-29).[13] She was transported to Tufts Medical Center, where she was admitted for three days. (*Id.* at 133). Thereafter, she requested, and was granted, a leave of absence from Emerson. (*Id.* at 149-50). She then flew home to Florida to be with her parents. (*Id.*).

On November 19, the Office of the Dean of Students sent an e-mail to Doe's professors informing them that she would be out of class from November 15 through November 26, 2012, for personal reasons. (*Id.* at 151; Def. Tab 31). The e-mail instructed her professors: "Under the circumstances, please give [Doe] reasonable consideration to make up any work that is missed. Should you have any questions about what is reasonable from an academic perspective please consult your Department Chair." (Def. Tab 31).[14]

### b.    The New Allegation Against Student A

Doe returned to class as scheduled in late November to complete the semester. (*Id.* at 151-52). After she returned to campus, she met with David Haden, the Associate Dean and

---

[12] The CPD sent the results of the investigation to the Middlesex District Attorney's Office, which made the final decision that there was not sufficient probable cause to proceed. (Def. Tab 19 at 123-24).

[13] That night, Doe's friend found her in her dorm room next to a spilled bottle of pills. (Def. Tab 1 at 128). Doe testified that she spilled the bottle because she was contemplating suicide. (*Id.*). The friend reported the incident to Doe's resident assistant. (*Id.* at 128-29). The resident assistant notified the resident director on duty, who in turn called paramedics. (*Id.* at 129).

[14] Doe argues that Emerson "never offered to have Doe's lectures recorded or provide Doe with class notes." (Pl. Opp. to Mot. for Summ. J. at 18). There is no evidence in the record that Doe requested either form of accommodation.

Director of the Office of Housing and Residence Life.  (Def. SMF ¶ 9; Def. Tab 32 at 42-43).

The purpose of the meeting was to discuss Doe's hospitalization for suicidal ideation and

Emerson's policy on medical leave.  (Def. Tab 1 at 155).

According to Haden, he referred Doe for mandatory counseling through Emerson's

counseling program and encouraged her to take advantage of the opportunity to speak with a

professional counselor.  (Def. Tab 32 at 43-44).[15]  Haden contends that the conversation focused

exclusively on Doe's hospitalization and leave.  (*Id.* at 43).  He contends that Doe "made it very

clear" that she did not want to discuss the sexual assault and he "respected that choice."  (*Id.* at

43).

Doe's version of the conversation is substantially different.  Doe alleges that Haden told

her that if she attempted suicide again, she would not be allowed to live on campus.  (Def. Tab 1

at 158-59).  She contends that he told her that living on campus was mandatory for freshmen and

sophomores at Emerson, so if a similar incident occurred again, she would not be able to attend

Emerson.  (*Id.* at 156-57).

As noted, Doe initially reported to the ECPD and the CPD that she had been vaginally

raped by a male, without mention of any other perpetrator.  (Def. Tab 18; Def. Tab 19 at 31-33).

According to Doe, she told Haden that she had remembered new information concerning the

incident on the night of October 13.  (*Id.* at 155).  She alleges that she told Haden that Student A

took part in the October assault.  (*Id.* at 155).  She also alleges that he told her "she shouldn't

speak about this to other people," and that "his words were to keep quiet," although she "can't

remember if those were his exact words."  (*Id.* at 155, 160).  Again, Haden contends that Doe did

---

[15] Doe saw a therapist at the Emerson Counseling Center after the meeting, although she does not remember the therapist's name.  (Def. Tab 1 at 161).

not want to discuss the assault.  (Def. Tab 32 at 43).

On December 13, Doe notified a female student resident assistant that she now had a memory that Student A had also participated in the sexual assault.  (Def. Tab 1 at 163-65; Def. Tab 10 ¶ 17 & Ex. 3).

Doe requested that Student A be moved to a different floor or moved out of the Little Building entirely.  (*Id.* at 165).  The resident assistant referred her to her resident director, Courtney, and separately e-mailed Courtney concerning the new allegations.  (*Id.* at 165; Def. Tab 10 ¶ 17).  Courtney notified both Haden and Michael Arno, the Director of Student Conduct and a Title IX Investigator, about Doe's new allegations immediately after that conversation.  (Def. Tab 10 ¶ 18 & Ex. 3).  Haden, Arno, and Courtney expressed doubts to one another by e-mail about whether Student A could be forced to move based solely on the new allegations, but discussed possible options for going forward.  (Def. Tab 10 Ex. 3; Pl. Tab 121).

On December 14, at her request, Doe met with a CPD investigator.  (Def. Tab 24 at 13-14; Def. Tab 29; Def. Tab 19 at 18).  She gave him a two-page handwritten statement detailing the new version of the attack.  (*Id.*).

The handwritten statement included many new details and allegations, including a claim that Student A had been present inside the fraternity house and had participated in the sexual assault.  Doe wrote that she remembered Student A "making eye contact with [MIT Student] and winking at him," and then leaving, supposedly to go to the bathroom.  (Def. Tab 29).  She then wrote:

> When [MIT Student] brought me into [the] room I saw a female figure standing across from [the] doorway.  I only remembered this recently.
>
> I also remember [Student A's] voice saying "Fucking do it already," this when [MIT Student] paused before actually pennetrating [sic] me.  I was on the ground/my eye and head had already been hit against [the] wall.  I remember him

fidgeting → I think he was putting [a] condom on.

A detail that also only just came back was that he never took his pants off completely and physically pushed his penis (in a condom) in me. While this was happening I was pushing to get up and I rememb[er] now a hand, not [MIT Student's] since it came from above pushing me down in my face and then my shoulder. At this point I gave up because I was bleeding (vaginally), and I was emotionally/physically shocked. 2 minutes of silent *sex* happened and then the <u>door opened</u> but [MIT Student] was still physically on me (my upper thighs). I saw light but didn't completely open my eyes because I was so shocked. I now remember [Student A] saying "Tell her she can go home now" and the door shutting. Then a 2 minute or so gap happened that I can't piece together. [MIT Student] was still pushing his knees in my thighs. Then he said "you can go home now." When I walked out I remember feeling really dizzy and sitting on a sidewalk outside [the] house driveway. At this point I <u>saw</u> [Student A] walking back into the House driveway. She didn't make eye contact → I was to [sic] paralyzed that I did not piece anything together.

(*Id.*).[16]  She also wrote that she "felt way more out of it than [she] should have for the amount [she] drank," suggesting that Student A may have put something in her drink.  (*Id.*).

Later on December 14, Doe met with Courtney.  (Def. Tab 10 ¶ 20).  She told Courtney that Student A had been involved in the attack and again asked that Student A be required to switch rooms.  (*Id.*; Def. Tab 1 at 163-65).  Courtney explained that Student A could not be forced to move until a formal complaint was filed.  (Def. Tab 1 at 165).  According to Doe, Courtney did not explain the complaint process.  (*Id.* at 165-66).  Although Doe initially felt that she could trust Courtney's advice, she later came to believe that Courtney did not know enough about the Title IX process to advise her about whether to pursue a police investigation.  (*Id.* at 181).  She also alleges that Courtney "pushed her away from continuing" with the investigation. (*Id.*).

Following the meeting, Courtney consulted with Ronald Ludman, the Emerson Dean of

---

[16] The complaint in this case alleges that "Student A sexually assaulted Doe by performing oral sex on her." (Compl. ¶ 27).  It does not appear, however, that Doe ever made such an allegation to Emerson or the CPD, and she did not so testify in her deposition.

Students; Alexa Jackson, the Associate Vice President of Human Resources and the Title IX Coordinator; and Arno.  (Def. Tab 10 ¶¶ 20-21).  The four determined that Doe should meet with Arno to discuss the new allegations against Student A.  (*Id.*).  Doe then met with Arno and told him that Student A had been involved in the October incident.  (*Id.* ¶ 22 & Ex. 7).

On December 15, two days after making her new allegations against Student A to her resident assistant, Doe finished her final examinations and flew home for winter break.  (*Id.* ¶ 23; Def. Tab 1 at 151-52).  On December 17, Arno sent Doe a written summary of their meeting and informed her that the investigation would continue when she returned to campus for the spring semester.  (Def. Tab 10 Ex. 7; Def. Tab 33).

Doe returned from winter break on January 16, 2013.  (Def. Tab 1 at 174-75).  Although Emerson had not immediately granted Doe's request to transfer Student A to another residence hall, Student A moved into a different building for unrelated reasons during winter break.  (Def. Tab 10 ¶¶ 25-26).  Therefore, as of the beginning of the spring semester, Doe and Student A no longer lived in the same building.

### 2.   Emerson's Investigation of the New Allegations

On January 25, Arno sent Doe an e-mail to inform her that he and Kimberly Marcella, the Associate Director of Employment and the Deputy Title IX Coordinator, would be leading the investigation of Student A's participation in the October 2012 incident.  (Def. Tab 36).  Both Arno and Marcella had been trained in Title IX procedures and related issues, including sexual harassment claims and the administration of student-conduct boards.  (Def. Tab 8 at 26-28; Def. Tab 4 at 13-17).  Among other things, the two had attended a training session in March 2012 on how to conduct a Title IX investigation, how to write reports, and otherwise how to meet a

college's obligations under Title IX.  (Def. Tab 8 at 29; Def. Tab 4 at 12).

In late January, Doe met separately with Arno and Marcella.  (Def. Tab 4 at 118, 123). They discussed the investigation plan, and Doe related her memories of the October incident and provided the investigators with a list of potential witnesses.  (*Id.* at 118-23; Def. Tab 1 at 194).[17]

For approximately the next two weeks, Marcella and Arno interviewed the witnesses identified by Doe.  (Def. Tab 4 at 154; Pl. Resp. to Def. SMF ¶ 133).  Doe testified that she attempted to, but ultimately did not, produce medical and police records supporting her allegations to the investigators.  (Def. Tab 1 at 197-98; Def. Tab 3 at 385-86).

On February 15, Arno and Marcella met to discuss the investigation.  (Def. Tab 8 at 203-04).  They concluded that the evidence did not support a determination that Student A had been involved in the October 2012 sexual assault.  (*Id.* at 206-07).  That determination was based, among other things, on their interviews with witnesses who stated that Student A had left the fraternity around the time that Doe alleged the sexual assault had occurred; witness reports that Doe did not appear intoxicated; and a statement by a witness that he drank from Doe's glass with no adverse effects.  (*Id.* at 256-57).  They did not, however, interview Student A before arriving at that conclusion, because they had created an investigation plan with Doe pursuant to which

---

[17] On January 30, Doe told Courtney she had become pregnant as a result of the October assault.  (Def. Tab 10 ¶ 30).  Courtney met with her and encouraged her to schedule a doctor's appointment, discuss her options with family, and attend a scheduled counseling appointment.  (*Id.*).  On January 31, Doe sent an e-mail to Courtney reporting that she had attended an appointment at Planned Parenthood that morning at 6:30 a.m. and had confirmed that she was pregnant.  (*Id.* ¶ 31; Def. Tab 41).  She e-mailed Courtney again at 4:07 p.m. that day and reported that she had undergone an abortion at 1:30 p.m.  (*Id.*).  Courtney notified other Emerson administrators, including Doe's counselor, about her report.  (Def. Tab 10 ¶ 32).  Courtney met with her again on February 4 to check on her well-being; Doe told her that she had to undergo a second procedure to end the pregnancy because she had been told during a medical examination at Tufts that the first had been unsuccessful.  (*Id.* ¶ 33).  Courtney offered her counseling and support, and met with her again on February 12.  (*Id.* ¶¶ 33-36).

Doe contends that the pregnancy was the result of the October 13 incident.  (Def. Tab 1 at 189).  There are no medical records in evidence concerning the pregnancy or its termination.  Doe reported during her examination at Tufts on October 15 that she had taken a "morning-after" pill the day after the alleged assault.  (Def. Tab 22 at 1).  As noted, Doe had told the CPD that her assailant had worn a condom, and the forensic examination revealed no evidence of seminal fluid.

they were to meet with Doe to review the status of the investigation before interviewing Student A.  (*Id.* at 211-12; Def. Tab 1 at 195-96).  They planned to interview Student A before formally concluding the investigation.  (Def. Tab 8 at 212).

On February 19, Arno and Marcella met with Doe and told her that they had not found sufficient evidence to move forward with a disciplinary proceeding against Student A.  (Def. Tab 1 at 200).  Arno also informed her that he would meet with Student A the following week to discuss the allegations against her and to issue a Stay Away Directive.  (Pl. Resp. to Def. SMF ¶ 141).

### 3.      The Reports of Harassing Messages

At about 6:30 p.m. on February 19—within a few hours of receiving the report from Arno and Marcella that there was insufficient evidence to proceed—Doe reported receiving anonymous harassing voicemail and text messages.  (Def. Tab 1 at 209-10; Def. Tab 10 Ex. 25).  The messages did not identify the sender, and were sent by online messaging services that enable the free, anonymous transmission of voicemail and text messages.  (Def. Tab 1 at 209-10; Def. Tab 54).

An e-mail sent that night by Arno to Ludman, Marcella, Courtney, Haden and one other person summarized the content of the messages.  (Def. Tab 10 Ex. 25).  It stated that the messages made statements along the lines of "Go Die"; "[MIT Student] and I got away with it, leave it alone"; "No one believes you and the College isn't going to do anything"; and "You are dirty, you are a whore, etc."  (*Id.*; Def. Tab 56).

Doe contends that the messages were sent by Student A.  (Def. Tab 1 at 212-13).  At that point, the investigators had not yet notified Student A of Doe's allegations or advised Student A that they had found insufficient evidence to move forward with a disciplinary proceeding.  (Def.

Tab 10 Ex. 25).

The resident director on duty, Max Coronel, notified Arno of the new allegations.  (Pl.
Resp. to Def. SMF ¶ 144).  Coronel met with Doe and confirmed that she felt safe and did not
want to transfer rooms.  He encouraged her to file a police report and offered her the opportunity
to speak to a counselor, which she declined.  (*Id.*).[18]

On February 20, Doe reported receiving the anonymous messages to the ECPD.  (Def.
Tab 54).  That same day, Arno contacted the Emerson Director of Information Technology to
determine whether the technology department could identify the sender of the messages.  (Def.
Tab 62).  After an investigation, the IT department learned that it would not be able to trace the
origin of the messages, and that the source of the messages would be available, if at all, only to
law-enforcement agencies through the use of subpoenas.  (*Id.*; Def. Tab 61 at 74, 79).

Also on February 20, Arno and Marcella interviewed Student A concerning the allegation
of sexual assault.  (Def. Tab 8 at 245-46, Def. Tab 57).  Student A denied any involvement.  She
stated that although she had accompanied Doe to the party, she left for another party before
entering.  (Def. Tab 8 at 245-46).  Arno and Marcella gave Student A a Stay Away Directive
prohibiting her from contacting or communicating with Doe in any manner.  (*Id.* at 282; Def.
Tab 60).

Marcella then notified Doe that a Stay Away Directive had been issued to Student A, and

---

[18] At some point, Doe began seeing Elise Harrison, the Emerson Director of Counseling, for therapeutic
counseling.  (Pl. Tab 116 at 105).  Doe contends that she "was unable to obtain consistent and meaningful
counseling services through Emerson due to the inadequacies of Emerson's counseling center."  (Pl. Opp. to Mot.
for Summ. J. at 16).  The only evidence in the record to which Doe refers as support for that statement is
(1) testimony that the hours of the counseling center at the time were 8:45 a.m. to 5:00 p.m., Monday through
Friday, with a therapist on call after hours, (Pl. Tab 116 at 19-22); and (2) Doe's deposition, in which she testified as
follows:  " . . . I had been seeing Elise Harrison but not frequently, as at this point Emerson Counseling Center could
only – only has so many therapists and it was high in demand so it wasn't – it wasn't available as much as I
probably needed it to be."  (Def. Tab 1 at 203-04).

provided her with a copy of the Directive.  (Def. Tab 60).  Doe replied that she was not comfortable with Student A being on campus or visiting her floor.  (*Id.*; Def. Tab 1 at 239). Arno explained that Student A had denied sending the messages, and because they could not confirm that she had sent them, Emerson could not ban Student A from Doe's floor.  (*Id.*).

On February 21, Doe reported to Arno that she received a new harassing call and two harassing text messages.  (Def. Tab 60).  The new messages had been sent through another online service that allowed for the anonymous transmission of messages.  (Def. Tab 8 at 282-85).[19]  Arno scheduled a meeting with Doe for the following morning and the two discussed the messages.  (*Id.*).  Arno e-mailed Doe on March 1 to check on her well-being, inquire as to whether the messages had stopped, and to notify her that the investigation would continue.  (Def. Tab 64).[20]

On April 26, Arno informed Doe that "while the content of the messages you reported receiving violate College policies, the College unfortunately has been unable to identify the sender(s) of the various messages you have received since February."  (Def. Tab 89).  He "strongly encourage[d]" her to report the incidents to the Boston Police, which would have "greater ability than the College to track such messages," "including the possible ability to subpoena information from Internet providers."  (*Id.*).  He also advised her that he had consulted with the ECPD, which had offered to assist her in reporting the messages to the police.  (*Id.*).  It does not appear that Doe ever did so.

---

[19] In early April, Doe reported receiving additional messages from the same online source.  (Def. Tab 65).

[20] Arno sought further assistance from the IT department to aid in the investigation.  The IT department determined that web traffic logs were deleted every 48 hours because of traffic volume, and that it would therefore be difficult or impossible to determine whether anyone in the Emerson community had accessed the anonymous-sending sites at the time the messages were sent; furthermore, at least one site allowed a user to schedule sending at a later time.  (Def. Tab 61 at 31, 74; Def. Tab 67).

### 4.      **The March 2013 Incident**

On March 1, 2013, Doe reported that she had been the victim of a second sexual assault. (Def. Tab 68).  Specifically, she reported that both MIT Student and Student A had sexually assaulted her in an alley off a public street in Boston that afternoon.  (*Id.*).

When Doe reported the assault, she provided a handwritten statement to her resident assistant at Emerson.  (*Id.*).  The resident assistant then notified the ECPD, which responded immediately.  (*Id.*).

The handwritten statement indicated that Doe had been standing at the corner of Boylston and Tremont Streets in Boston when she saw MIT Student and Student A.  (*Id.*).  She "went towards Chinatown" to try to avoid them, but they followed her down Boylston Street.  (*Id.*).

> They caught up to me right near where the homeless shelter place [is].  There is an alley like right near there; and she took her hand and put it down my shirt threatening she was going to kill me while holding my boob.  Then said if I played nice she would make everything better at school.  I fell and tried to get back up but [MIT Student] (the guy) put his hand on me and forced me to stay down.  She unzipped my pants and fingered me.

(*Id.*).[21]

Doe reported that the sexual assault had occurred that afternoon, at about 3:30 p.m. on March 1.  (*Id.*).  She reported the assault at approximately 8:30 p.m., or about five hours later. (*Id.*).  She said that immediately after the assault, she went back to her room and fell asleep. (Def. Tab 69 Ex. E).  When she woke up, around 8 p.m., she told two friends about the assault and wrote down her statement.  (*Id.*).

The ECPD officer notified Doe of her option to seek medical treatment, which she

---

[21] When Doe was asked at her deposition whether she was pulled into the alley, she answered "no."  (Def. Tab 1 at 254).  She was then asked how she got into the alley; she answered, "I can't give a definite description of that right now."  (*Id.* at 254-55).  She also testified that the sexual touching had occurred on the outside of her clothes, not the inside.  (*Id.* at 256).

declined.  (Def. Tab 68).  The officer referred the incident to the Boston Police Department, which began an investigation.  (*Id.*).[22]

Doe flew home to Florida for spring break the following day, March 2.  (Def. Tab 1 at 258).  On March 6, Ludman called Doe at home in Florida to speak with her about the availability of counseling and therapy services.  (Pl. Resp. to Def. SMF ¶ 171).  With Doe's permission, Ludman later spoke with her mother, telling her that he was concerned for Doe's well-being.  (Pl. Resp. to Def. SMF ¶ 174).  At Doe's request, he did not disclose that Doe had reported a sexual assault on March 1.  (*Id.*).

Also on March 6, Ludman spoke with Student A concerning the new allegation of sexual assault.  (Pl. Resp. to Def. SMF ¶ 175).  On March 8, Ludman issued a new Stay Away Directive to both Student A and Doe, prohibiting each from entering the other's residence hall.  (Def. Tab 75).

On March 12, Ludman met with Student A.  Student A informed him that she had not been in Boston at the time of the alleged incident and also stated that she had retained an attorney.  (Def. Tab 77).

In the course of its investigation, the BPD learned from MIT that MIT Student had been admitted to the infirmary at the time that Doe alleged that she was assaulted.  (Def. Tab 19 at 26).  It also reviewed street videos from the scene of the alleged incident and could not locate either MIT Student or Student A at the relevant times.  (*Id.*).  There is no forensic or eyewitness evidence in the record corroborating Doe's allegation.

On March 13, the BPD notified the ECPD that it had completed its investigation and the Suffolk District Attorney's Office would not prosecute the matter.  (Def. Tab 78).

---

[22] Among other things, certain items of her clothing were taken into evidence by the BPD.  (*Id.*).

On March 18, Student A, through her attorney, provided Jackson with evidence that that she had been on a bus headed to New York at the time of the alleged incident. Among other things, she provided an Emerson departure slip dated March 1 stating that she was leaving campus; a receipt for a Bolt Bus ticket for a trip that left Boston that day at 11:30 a.m. and was scheduled to arrive in New York at 3:45 p.m.; copies of text messages indicating that at 11:06 a.m., she was in line to board the bus, and by 11:15 a.m., had boarded the bus; copies of text messages sent by her from the bus at 12:13 p.m., 1:40 p.m., and 2:45 p.m.; a one-way New Jersey Transit bus ticket purchased at 4:19 p.m.; and copies of text messages indicating that her father had picked her up at a mall in Wayne, New Jersey, at 5:23 p.m. (Def. Tab 69 Ex. D).

On March 22, Arno and Marcella met with Doe to discuss the alleged incident. (Def. Tab 69 ¶¶ 18-19). During that meeting, Doe again stated that she had been assaulted by Student A and a male; she said that she assumed the male was MIT Student, although she now said she was not sure of his identity. (*Id.* ¶ 19; Def. Tab 1 at 287-88).[23] She was, however, "100% sure" that Student A was the female who assaulted her. (Def. Tab 69 Ex. E). Doe also stated that she "now believed the assault took place between 1:45 and 2:15 p.m." (Def. Tab 69 ¶ 19).[24]

At the meeting, Doe requested that her allegations be heard before an Emerson conduct-board hearing. (Def. Tab 69 Ex. E). Arno responded that Emerson would determine what further proceedings should take place at the conclusion of the investigation. (*Id.*).

Ultimately, the Emerson investigators concluded that Student A had submitted "credible

---

[23] When asked at her deposition in November 2016 whether she had any doubts about the identities of the alleged March 1 attackers at the time that she made the allegations, Doe stated that she did not know whether she had any doubts about who was involved. (Def. Tab 1 at 260). She also stated that as of the date of her deposition in 2016, she had no memory of the identity of her alleged attackers. (*Id.* at 261).

[24] According to text messages sent by Student A, she was on a bus in New Haven, Connecticut, heading to New York, at 1:40 p.m. (Def. Tab 69 Ex. D).

and compelling" evidence that she was not in Boston at the time of the alleged incident and did not commit a sexual assault on Doe.  (Def. Tab 69 ¶ 16).

### 5.     The Note Found in Doe's Residence Hall

On March 22, Doe notified Jackson that she had found a handwritten note signed by Student A in the common room of her residence hall.  (Def. Tab 1 at 275; Def. Tab 85).[25]  In a meeting with Title IX investigators, Student A admitted that she had written the note.  (Def. Tab 3 at 425-27).  However, a friend, not Student A, had delivered the note to the common room. (*Id.* at 427).  Ultimately, Emerson determined that the note did not violate the Stay Away Directive because Student A did not intend for Doe to see it.  (Def. Tab 49).

### 6.     The Conclusion of the Investigation

On May 2, Emerson sent Doe a written notice reviewing the evidence and concluding that the evidence did not support charging Student A with a violation of the conduct code for any of the allegations made against her.  (Def. Tab 49).  They notified Doe that the college would not move forward with a conduct-board hearing against Student A.  (*Id.*).

In the fall of 2013, Doe returned to Emerson for the 2013-14 academic year.  (Def. Tab 1 at 306).  In October 2013, Doe requested a new Title IX investigation and stated that she wanted to work with a new team of investigators.  (Def. Tab 91).  She also requested an appeal of Emerson's decision not to refer her allegations to a conduct-board hearing.  (*Id.*).  Ludman denied that request.  (Def. Tab 80).  Doe completed the 2013-14 year and the fall semester of the 2014-15 year.  (Def. Tab 1 at 343).  She left Emerson shortly after the commencement of the spring 2015 semester.  (*Id.*).

Neither MIT Student nor Student A attempted to contact Doe again after the spring of

---

[25] The note read: "Dear Everyone!  I miss you all so much!  Come play with me!  And by play I mean perform dirty sexual deeds. Lol JK hopefully see you all soon!!  Love, [Student A]."  (Def. Tab 85).

2013, nor did she report receiving any additional anonymous e-mails, voicemails, or text messages.  (*Id.* at 313-14).

Doe contends that she suffered a panic attack and a prescription drug overdose in February 2014, and a further drug overdose in September 2014.  (*Id.* at 319, 337).  Emerson granted her an accommodation as to the first incident, although she contends that one of her professors did not appropriately implement it.  (*Id.* at 320-24).  Doe eventually withdrew from Emerson in the spring of 2015.  (*Id.* at 343).  She contends that she continues to suffer from low self-esteem, post-traumatic-stress disorder, and major depression, which she attributes, at least in part, to Emerson's conduct.  (Pl. Tab 109 at 12-18).

### B.    Procedural Background

Doe filed the complaint in this action on December 31, 2014.  The complaint alleged three claims under state law against Emerson and various Emerson officials, and a fourth claim against Emerson alone for violation of Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681.  The Court granted defendants' motions for judgment on the pleadings as to all state-law claims and dismissed the individual defendants.  (ECF Nos. 28, 36).  Emerson's motion for judgment on the pleadings as to the Title IX claim was denied.

Emerson has now moved for summary judgment as to the sole remaining claim, the claim for violation of Title IX.

## II.    Standard of Review

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).  Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A

genuine issue is "one that must be decided at trial because the evidence, viewed in the light most

flattering to the nonmovant, would permit a rational fact finder to resolve the issue in favor of

either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990)

(citation omitted).  In evaluating a summary judgment motion, the Court indulges all reasonable

inferences in favor of the nonmoving party.  *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st

Cir. 1993).  "[W]hen a properly supported motion for summary judgment is made, the adverse

party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (footnotes and internal quotation marks omitted).

The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but

instead must "present affirmative evidence." *Id.* at 256-57.

## III.   Analysis

To succeed on a Title IX claim against an educational institution, a plaintiff must show

"(1) that [he or she] was a student, who was (2) subjected to harassment (3) based upon sex;

(4) that the harassment was sufficiently severe and pervasive to create an abusive educational

environment; and (5) that a cognizable basis for institutional liability exists." *Frazier v.

Fairhaven Sch. Comm.*, 276 F.3d 52, 66 (1st Cir. 2002).  To satisfy the fifth part of that standard,

a plaintiff must show that a school official authorized to take corrective action had "actual

knowledge" of the sexual harassment and either failed to act or exhibited "deliberate

indifference" to it.  *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998);

*Frazier v. Fairhaven Sch. Comm.*, 276 F.3d at 66; *Doe v. D'Agostino*, 367 F. Supp. 2d 157, 164-

65 (D. Mass. 2005).  In cases of student-on-student sexual harassment, a school will be found to

be deliberately indifferent only where its response "is clearly unreasonable in light of the known

circumstances." *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999).  Furthermore, to prove liability, a plaintiff must show that the school's deliberate indifference subjected him or her to harassment or made him or her vulnerable to it.  *Id.* at 645. If an educational institution takes "timely and reasonable measures to end the harassment, it is not liable under Title IX for prior harassment." *Wills v. Brown Univ.*, 184 F.3d 20, 26 (1st Cir. 1999).  However, if earlier measures have proved inadequate to prevent further harassment, a school "may be required to take further steps to avoid new liability." *Id.*

Doe contends that Emerson was deliberately indifferent to her complaints of sexual harassment in a number of ways.

### A.    Alleged Inadequate Investigation and Response

First, Doe contends that Emerson did not adequately investigate or otherwise respond to her allegations of sexual assault and harassment.  Under some circumstances, an educational institution's failure to adequately respond to complaints of sexual harassment may constitute deliberate indifference.  *See Leader v. Harvard Univ. Bd. of Overseers*, 2017 WL 1064160, at *4 (D. Mass. Mar. 17, 2017).  However, "Title IX does not require educational institutions to take heroic measures, to perform flawless investigations, [or] to craft perfect solutions." *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 174 (1st Cir. 2007), *rev'd on other grounds*, 555 U.S. 246 (2009).  Instead, a school will not be held liable for deliberate indifference if it takes "timely and reasonable" measures to address the harassment.  *Wills v. Brown Univ.*, 184 F.3d at 26.

Here, the undisputed facts in the record demonstrate that Emerson's response to Doe's allegations was timely and reasonable.  Emerson officials responded to each of her complaints in a timely manner.  When Doe made her first complaint of sexual assault, a resident assistant and resident director responded within hours, offering her support and notifying her of the medical

and mental-health services available to her.  When Doe made new allegations against Student A,

her resident director and a Title IX investigator met with her the same day to initiate an

investigation.  Days later, she left campus for winter break, and the formal investigation

commenced less than two weeks after her return.  Ultimately, the investigators concluded that

there was insufficient evidence to bring disciplinary charges against Student A.  Nonetheless,

officials issued a Stay Away Directive to Student A about a month after the students returned to

campus.  No reasonable juror could find that those actions were untimely or unreasonable under

the circumstances.

Doe made new allegations of sexual harassment and assault after the school had

conducted its initial fact-finding and response.  The record demonstrates that as the allegations

and evidence developed, so too did Emerson's response.  After Doe reported receiving harassing

messages, Arno, with the help of the technology department, attempted to investigate the source

of those messages.  After Doe made a second allegation of sexual assault, Emerson officials

responded immediately.  Like the Boston Police, they concluded that Student A's evidence that

she was not in Boston at the time of the alleged assault was convincing, as they were permitted

under the circumstances to do.  After Doe reported finding a note written by Student A, Emerson

issued a more restrictive Stay Away Directive.  The undisputed evidence demonstrates that

Emerson investigators were responsive to Doe's claims and took justifiable corrective action in

the face of changing circumstances.  This is not a case "where a school 'continued to use the

same ineffective methods to no acknowledged avail.'"  *Porto v. Town of Tewksbury*, 488 F.3d

67, 75 (1st Cir. 2007) (quoting *Vance v. Spencer Cty. Pub. Sch. Dist.,* 231 F.3d 253, 262 (6th Cir.

2000)).

Doe contends that the investigation was unreasonable because Arno and Marcella "fail[ed] to exhaust all possible options while investigat[ing] Doe's repeated complaints of harassment."  (Pl. Opp. to Mot. for Summ. J. at 14).  Among other things, Doe contends that investigators should have interviewed Student A before determining that there was insufficient evidence to proceed with a disciplinary proceeding; that they should have attempted to obtain the results of her sexual assault kit independently when Doe failed to produce those results; that they should have done more to track the origin of the anonymous messages Doe received; and that they should have somehow attempted to verify the documentation Student A submitted to establish her whereabouts on March 1, 2013.  Again, the standard is not perfection; it is whether the college's response was "clearly unreasonable."  *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. at 649.  Although Doe claims that Emerson's response did not immediately stop the harassment, that fact alone is not sufficient to create liability where a school's response was otherwise timely and reasonable.  *Porto v. Town of Tewksbury*, 488 F.3d at 74 ("[T]he fact that measures designed to stop harassment prove later to be ineffective does not establish that the steps taken were clearly unreasonable . . .  The test for whether a school should be liable under Title IX for student-on-student harassment is not one of effectiveness by hindsight.").  The question is not whether Emerson could possibly have done more to investigate Doe's claims; it is whether the investigation was so deficient as to be unreasonable, and it clearly was not.

Doe also objects to various conclusions Emerson made in the course of its investigation, including the conclusions that Student A did not violate the Stay Away Directive and that Student A's evidence that she was not in Boston at the time of the alleged March 2013 incident was credible.  However, Title IX does not guarantee that an investigation will yield the outcome

that a complainant desires.  Nor does it require that all complainants be deemed credible, simply because they are complainants.  A school satisfies its obligations if it engages in a reasonable process for investigating and addressing claims of sexual harassment.  *See Wyler v. Conn. State Univ. Sys.*, 100 F. Supp. 3d 182, 195 (D. Conn. 2015) ("No reasonable jury could find deliberate indifference based on plaintiff's speculative assertion that additional investigatory steps might have changed the outcome of the investigation or disciplinary process in some way.").  Whether or not every decision Emerson made in the course of its investigation was correct is not the appropriate focus of a Title IX claim.  Again, there is no genuine basis for dispute as to whether Emerson's response and investigation were clearly unreasonable under the circumstances.

### B.    Alleged Discouragement

Doe further contends that Emerson should be held liable under Title IX because certain Emerson administrators allegedly discouraged her from reporting her allegations of sexual assault.  Specifically, Doe contends that Haden and Courtney discouraged her from pursuing a police investigation.  She does not contend that either individual actually told her that she should not pursue such an investigation.  Instead, she stated that she "feels" that Courtney discouraged her, without pointing to specific statements made to inspire that feeling.  She also points to a single conversation with Haden, during which, she contends, he communicated that she should not speak to others about her new allegation against Student A and that she should keep it quiet, although she could not remember his exact words.  (Pl. Opp. to Mot. for Summ. J. at 18-20).

Haden and Courtney deny that Doe's version of those conversations is truthful.  On summary judgment, of course, the Court must view the evidence in the light most favorable to Doe.  But even if Haden or Courtney acted as Doe said they did, they were clearly ineffective in discouraging her or impeding any investigation.  Virtually immediately after meeting with

Haden, Doe reported her allegations against Student A to the CPD.  And there is no evidence that she was deterred or delayed at any point from pursuing a claim based on conversations with Courtney.

In light of the relatively scant evidence that Courtney or Haden made any specific comments discouraging Doe from reporting the assault, and the strong evidence that she was undeterred in any way from making such a report, no reasonable juror could find that either Courtney or Haden's alleged discouragement can form the basis for liability against the college under Title IX.  *See Wyler v. Conn. State Univ. Sys.*, 100 F. Supp. 3d at 194 (holding, on a motion for summary judgment, that plaintiff's allegations that officials had told her to "let it go" was "not sufficiently severe or pervasive in and of itself to constitute harassment or a hostile environment").

### C.    <u>Alleged Failure to Train</u>

Finally, Doe contends that Emerson's failure to train staff adequately to respond to and investigate claims of sexual harassment and assault constitutes a violation of Title IX.  Some courts have found that a school can be liable for an "official policy . . . of deliberate indifference to providing adequate training or guidance that is obviously necessary for implementation of a specific program or policy of the recipient."  *Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170, 1178 (10th Cir. 2007).  At least one court has found that a school's liability for failure to train extends only to the situation where a school "sanctions a specific program that, without proper control, would encourage sexual harassment and abuse such that the need for training or guidance is obvious."  *C.T. v. Liberal Sch. Dist.*, 562 F. Supp. 2d 1324, 1339 (D. Kan. 2008).

It does not appear necessary here to define the extent of possible liability under Title IX for failure to train, because the record shows clearly that Emerson's training of the relevant

officials did not constitute deliberate indifference.  This is not a case where officials had no training whatsoever, or where the training was obviously or grossly inadequate.  Instead, Doe contends that the training was inadequate to enable officials to conduct a reasonable investigation.  The Court has already found that the officials conducted a reasonable investigation under the circumstances, and it is not at all clear what steps they should have taken but did not.  Doe makes a variety of conclusory allegations about the alleged inadequate training, but offers little by way of specifics, and has not shown how any alleged deficiencies cause any actual harm.

Furthermore, and in any event, the undisputed evidence in the record shows that the relevant decision makers had received adequate training.  It is undisputed that both Arno and Marcella had substantive training on issues related to Title IX, including on sexual harassment and student conduct proceedings.  Both individuals had also attended a formal training on the implementation of Title IX practices and policies in March 2012, only nine months before Doe made her first allegations against Student A.  Again, the question is not whether the relevant Emerson administrators could have been trained better, but whether a reasonable juror could conclude on the evidence that any inadequacies in training were so deficient that they constituted "encouragement of the [harassing] conduct" or otherwise amounted to deliberate indifference. *Simpson v. Univ. of Colo. Boulder*, 500 F.3d at 1177.  Here, the answer to that question is clearly negative.[26]

---

[26] Doe argues in opposition to summary judgment that the investigators were biased against her, and that "[e]-mails circulated among Emerson administrators repeatedly emphasized doubts as to the truthfulness of Doe's claims."  (Pl. Opp. to Mot. for Summ. J. at 14-15).  Her memorandum, however, cites no evidence to support that claim.  At another point, her memorandum cites to ¶ 296 of her statement of material facts, which in turn refers to Arno's deposition testimony.  That testimony indicates that after Arno had investigated the text messages and the voicemails, he became concerned—although he did not conclude—that Doe was not being truthful.  (Pl. Tab 105 at 84-85, 87-89, 281-89).  But the fact that Arno, after conducting an investigation, came to express doubts about her credibility is not evidence that the investigation was biased.  Under the circumstances, Arno was entitled to have those doubts.  Doe also points to a December 13 email exchange between Courtney, Haden, and Arno, in which the

In summary, the record evidence in this case, construed in the light most favorable to plaintiff, compels the conclusion that Emerson was not "deliberately indifferent" to her claims of sexual assault, and thus did not violate Title IX.  The motion for summary judgment will therefore be granted.

**IV.**     <u>**Conclusion**</u>

For the foregoing reasons, Emerson's motion for summary judgment is GRANTED.

**So Ordered.**

/s/  F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated:  September 26, 2017

---

participants essentially agreed that Doe's "new vague memories," without more, were an insufficient basis to require Student A to move rooms.  (Def. Tab 10 Ex. 3; Pl. Tab 121).  Again, that conclusion was not unreasonable under the circumstances.  No reasonable juror could conclude that that evidence showed an improper bias against Doe, let alone one sufficient to create liability under Title IX.